THE STATE OF NEVADA, Upon the Relation of FRANK RICHARDSON, Petitioner, v. THE BOARD OF REGENTS OF THE UNIVERSITY OF NEVADA, and SILAS E. ROSS, ROY A. HARDY, LOUIS E. LOMBARDI, NEWTON CRUMLEY and A. C. GRANT, Constituting the Members of said Board, Respondents.

No. 3759

April 20, 1954.                    . 269 P.2d 265.

See also 70 Nev. 144, 261 P.2d 515.

*Bruce R. Thompson, Leslie B. Gray, Bert Goldwater* and *Ralph K. Wittenberg,* all of Reno, for Petitioner.

*W. T. Mathews,* Attorney General, of Carson City, *Lester D. Summerfield* and *Harlan L. Heward,* Special Assistant Attorneys General, both of Reno, for Respondents.

# OPINION

By the Court, BADT, J.:

This is an original proceeding in certiorari to review the action of the board of regents of the University of Nevada discharging the petitioner, Dr. Frank Richardson, as a member of the faculty of the university, which action was taken after hearing pursuant to notice. The order removing petitioner was based upon findings that he had demonstrated insubordination, had not been cooperative and that his conduct had not been in accord with the welfare of the university. Such findings and the evidence supporting the same are the subject of a large part of our present inquiry, to be dealt with later.

So much publicity has been given to the case, both within and without the State of Nevada, and covering a period beginning even before the filing of the formal charges against petitioner and continuing to the submission of the matter to this court; so many conflicting theories have been injected into the case; so much has been said both in the briefs and in the oral arguments in attacking the matter from various angles, that we find it almost as important to indicate issues which are *not* presented to us as to define the issues presented for our determination. We are *not* called upon to determine the question of academic freedom. The case submitted does *not* call for the determination of any controversy thought to exist between the petitioner and Dr. Minard Stout, president of the university. As a court we may *not* consider the sufficiency or insufficiency of the curricula of the secondary schools or of the university itself.

The matriculation of Nevada high school graduates into the university, with or without quality credits (concerning which the regents have several times altered the policy of the university), is *not* a matter for our determination. The extent to which the regents may limit, curtail or eliminate entirely faculty participation in matters of the curriculum, entrance requirements or other academic policies is *not* involved in this proceeding. Petitioner does *not* attack the integrity or good faith of the board of regents. Our burden, heavy as it is, may be somewhat lightened by this clear understanding of issues not involved in this review. It is conceded that petitioner enjoyed "tenure" status whereunder he was not subject to discharge except for cause.[1]

Petitioner presents as the issue the determination as to whether, at the hearing held by the board of regents, legal cause was shown in support of the order of removal. This in turn involved a discussion of the evidence purporting to support the findings of insubordination, uncooperativeness, and conduct not in accord with the welfare of the university.

Such statement of the issue by petitioner is met by the contention of the regents that if the record shows that *any* evidence of the type required to support the ruling was presented, the court may on certiorari not inquire further; that as *some* evidence was introduced, further review may not be had by this court; that although consideration of the sufficiency of the evidence might be proper in proceedings in mandamus, injunction or other remedies, the remedy of certiorari sought by petitioner limits him to the question of the jurisdiction of the board of regents over the parties and the subject matter and the holding of a hearing after notice at which *some* evidence bearing a reasonable relationship to the order was adduced. The brief and the oral argument of the regents proceeded then to a rather full

---

[1]The pertinent provisions of the order of the board of regents establishing tenure are quoted in our opinion in State ex rel. Richardson v. Board of Regents, 70 Nev. 144, 261 P.2d 515.

discussion of the evidence to indicate a supporting record for the three findings.

Anticipating from our opinion denying the motion to dismiss the writ in this case, Richardson v. Board of Regents, 70 Nev. 144, 261 P.2d 515, and from our reference therein to Whalen v. Welliver, 60 Nev. 154, 104 P.2d 188, 1016, our probable disposition to hold that the question of the existence of cause for removal is one of law, respondents contend that it is for the board to determine what constitutes cause. In support of this view respondents rely upon the following statement of the Supreme Court of Illinois in Joyce v. Board of Education, 325 Ill. App. 543, 60 N.E.2d 431, 435:

"The question as to who shall determine what constitutes cause has frequently been presented to the court, and the rule to be deduced from the authorities is that where the statute is silent as to what constitutes cause, the right to determine the question is in the tribunal having jurisdiction of the particular officer or employee."

It is important to note however, that after making the foregoing statement the court proceeded to recite the facts in the case and then to hold that "the board was fully justified in finding that a teacher writing such a letter ought not to be permitted to continue as a teacher in the public schools." Having thus first held that the right to determine what constituted cause was in the board, the court then, as we have seen, proceeded to determine that the board was justified under the facts in finding cause. The court then reverts to its first position and says that "having jurisdiction of plaintiff as an employee of the board, it had the right to determine whether her conduct constituted cause for dismissal."

Respondents say that the Joyce case was approved in the later Illinois case of Eveland v. Board of Education, 340 Ill. App. 308, 92 N.E.2d 182. That case quotes the language recited above and concludes that the board had authority to determine *"in the first instance"* what causes were remediable and that the board was within

its rights in determining cause *"in the first instance."* Stiver v. State, 211 Ind. 380, 1 N.E.2d 1006, 1008, 7 N.E.2d 183, likewise is cited by respondents to the effect that mandamus by a teacher to compel rescission of an order of cancellation of his contract will not afford review of the *weight and effect* of the evidence upon which the administrative decision is based. That case does in fact so hold. On the other hand the court states the Indiana rule to be that "if the 'cause' assigned bears no reasonable relation to the accused's fitness or capacity to hold the position in question, or if there is no evidence to support a finding of 'cause' * * * it is the plain duty of a court to declare void a dismissal under such circumstances, and to give relief in an action for mandate." The court then reviews some of the evidence and says: "But the probative force of this evidence was such that the trial court could not say as a matter of law that it was not sufficient to support a conclusion that the relator in fact had neglected his duties * * *." The court goes on further to say: "It is a close question whether the evidence failed to support the charge of insubordination. We cannot say that there was not sufficient evidence to support the charges of 'neglect of duty' and 'lack of co-operation.'"

It is apparent that a confusing situation is presented by the Illinois and Indiana authorities relied upon by respondents. It is true that these courts pay lip service to the rule that it is the function of the administrative agency, at least in the first instance, to determine whether there is just cause for removal. It is just as apparent however, that these courts have then reviewed the evidence in order to determine whether the administrative tribunal had properly determined that just cause existed. Indeed in the Joyce case the Supreme Court of Illinois said that on certiorari the scope of review included the determination of "whether there was cause for removal." This appears to coincide with the holding of this court in Whalen v. Welliver, 60 Nev. 154, 104

P.2d 188, 190, 1016, defining cause as "legal cause, and not any cause which the council may have deemed sufficient. * * *"

It is not necessary for the purpose of this opinion that we review and discuss all of the ramifications of the subject. We may freely reject any consideration on certiorari of matters that do not go to the jurisdiction— nonjurisdictional errors that may have been committed by the respondent tribunal, a resolving of conflicting testimony in favor of one side rather than the other, accepting the testimony of one witness and rejecting the testimony of another. But, as we review the authorities, if under uncontradicted evidence certain actions of an employee are held by the tribunal to be cause for dismissal under the circumstances, we are not precluded, in certiorari, from determining, as a matter of law, that such actions are not cause for removal. In Richardson v. Board of Regents, 70 Nev. 144, 261 P.2d 515, we referred to Graves v. School Committee of Wellesley, 299 Mass. 80, 12 N.E.2d 176, 179, without quotation from that case. There Chief Justice Rugg, speaking for that eminent court, referred to earlier Massachusetts cases, saying: "The term removal 'for cause' means removal 'for cause sufficient in law. That can only be determined after an opportunity to be heard and a finding, so that the sufficiency of the cause may be determined in court.'" Later the court said: "While the decision whether proper charges have been substantiated rests with the school committee, an affirmative decision can be rendered only when the truth of the charges has been supported by evidence *adequate in law to warrant that conclusion.*" (Emphasis supplied.)

We need not follow the subject further. The authorities are overwhelmingly to the effect that the findings of the investigating board will be reviewed by the courts to determine whether cause for removal has been shown by the evidence. The question arose in various kinds

of proceedings—certiorari, mandamus, injunction, etc. The cases involved university regents, high school boards of education, boards of district school trustees, etc. The conclusion that we have reached we consider to be established law, and not in conflict with our consistent holdings confining our review on certiorari to the question of jurisdiction.

Before proceeding to a discussion of the facts a brief summary of the proceedings to date will be in order. On March 31, 1953, Dr. Minard Stout, president of the university, wrote a registered letter to petitioner requiring him to appear before the regents April 10, 1953, at 11: 30 a. m., to show cause why he "should be continued as a member of the faculty of the University of Nevada beyond June 30, 1953." The letter referred to petitioner as being a member of a small dissatisfied minority group whose "disturbing activities" over several years included (1) the attempt to develop friction between departments on the campus and (2) between the university and the public schools of the state, (3) the spreading of false information to imply the abolishment of many faculty committees, (4) to imply the lowering of academic standards, (5) to imply the maltreatment of faculty members by the administration, and (6) the alarming of faculty, townspeople and legislators without presenting the matter to the administration or to the faculty welfare committee; that these activities reached a climax during the recent legislative session, resulting in an investigation of university affairs by a special legislative committee to investigate rumors concerning conditions at the university.

A similar notice to show cause was directed to four other members of the faculty with appearances spaced at 30-minute intervals on the same date. Such hearing was stayed by a writ of prohibition issued out of this court pending the furnishing to petitioner of sufficiently adequate particulars of the grounds for dismissal. Such bill of particulars was served April 25, 1953, and comprised a pleading of ten typewritten pages, subdivided

into paragraphs numbered from 1 to 8, which in turn were divided into numerous unnumbered paragraphs. Charge No. 1 alleged generally an uncooperative and insubordinate attitude on the part of petitioner toward the dean of his college, the president and the regents. Paragraph 2 alleged his opposition to the relaxing of admission requirements and to his expressed intention to "fight any change in the present requirements in every way that he could." It is conceded that no evidence was offered in support of the quoted charge. Paragraph 3 had reference to his opposition to proposed abandonment of certain practices of distributing among the faculty the gradings made by each professor as to each student. The regents concede that no evidence supporting this count was adduced. Charge No. 4 is that in November, 1952, Dr. Richardson secured and distributed among the faculty reprints of an article by Dr. Arthur E. Bestor, Jr., entitled "Aimlessness in Education," which was "exceeding critical of public schools, Colleges of Education, Teachers Colleges and professional educators. This distribution of this article incensed a number of the Professors at the University of Nevada." Charge No. 4 further alleges that on November 19, 1952, Dr. Richardson had claimed that he had been abused by the president and that he had been treated unfairly by the president; also that in November and December of 1952 he indicated that he would continue his "fight" or "controversy;" with apparent reference to his opposition to the relaxing of entrance requirements. Charge No. 5 asserted that Dr. Richardson advocated legislation by the 1953 legislature permitting aliens to teach in this State. Charge No. 6 alleged that on April 21, 1953, he had refused to sign, in the form as written, a five-point statement submitted by the dean of his college, with the approval of the president. This was a similar statement submitted to three of the other four faculty members involved. Charge No. 7 alleged that petitioner had referred to the president as a dictator and further that petitioner had

stated that he had been abused by the president. Charge No. 3 alleged that the president had addressed a faculty meeting on the afternoon of February 18, 1953, and that on the same evening at a monthly meeting of the local chapter of the American Association of University Professors, petitioner stated untruthfully that the president had at the faculty meeting made an unfair and unjustified attack on the said A.A.U.P.

A hearing upon the charges was held May 25, 26 and 27, 1953. As noted, it was conceded that as to some of the charges no evidence had been adduced. Following the hearing the board made the following finding:

"The Board determines that Dr. Frank Richardson had demonstrated insubordination, that he has not been co-operative and that his conduct has not been in accord with the welfare of the University."

On the basis of this finding the board made its order of June 9, 1953, removing Dr. Richardson as a member of the faculty of the university.

That part of the record having to do with the finding of lack of cooperation and of conduct not in accord with the welfare of the university does not justify discussion at length. Some of the matters we dismiss as trivia; others involved matters not included within the original charges or within the bill of particulars but which occurred later than both of these instruments. They dealt largely with Dr. Richardson's refusal to resign, after the charges had been filed, and with his refusal to sign an instrument which, under the circumstances, would be considered by many as an admission of guilt and a promise of future good conduct and recognition of superior authority.

Only two counts are left that require consideration, and these are the two on which respondents most strongly rely. One deals with the charge that Dr. Richardson asserted that President Stout had made an unfair and unjustified attack on the organization known as American Association of University Professors (A. A.U.P.) ; the other has to do with Dr. Richardson's

distribution, about November 11 or 12, 1952, of some thirty copies of an article by Dr. Arthur E. Bestor of the University of Illinois, published in The Scientific Monthly, entitled "Aimlessness in Education."

A large part of respondents' brief and likewise of respondents' oral argument to this court deals with what is characterized as Dr. Richardson's false accusations against the president. In the oral argument, counsel referred to the same as atrocious untruths. Petitioner, president of the local chapter of the American Association of University Professors,[2] in opening the meeting of the association on the evening of February 18, 1953, stated in substance: "I am surprised to see so many here in view of the unfair and unwarranted criticism of the A.A.U.P. made by the president this afternoon."

The regents called some seven or eight members of the faculty to testify, first, that petitioner had made such statement and, secondly, that the president in his address to the faculty that afternoon had not attacked A.A.U.P. The president had said in part to the faculty that afternoon: "* * * I think it is time that we laid our cards on the table. * * * The university is under fire because of dissension in the faculty. When I

---

[2]The local chapter contained about 54 members of the University of Nevada faculty. The national association publishes a quarterly bulletin of 150 pages or more, and contains many well considered articles. Successive official bulletins of the university have described the association as follows:

"The Nevada Chapter of the American Association of University Professors meets informally seven or eight times during the University year to discuss questions of interest to the profession of university teaching and research. The objects of the association as defined in its constitution are: 'To facilitate a more effective cooperation among teachers and investigators in universities and colleges, and in professional schools of similar grade, for the promotion of the interests of higher education and research, and in general to increase the usefulness and advance the standards and ideals of the profession.'

"For the profession of university and college teaching and research, the position and functions of the association are analogous to those of the American Bar Association and the American Medical Association in their respective fields."

returned from Carson I found on my desk a notice of an A.A.U.P. meeting to be held tonight on faculty participation in university affairs. This is the sort of thing that reflects the attitude that there is dissension on the campus * * *. Has the president lowered standards? I spoke to A.A.U.P. on this subject last fall and presented research data to support my point of view. I invited the members to send me research on the other side and to this day there has been no response to this invitation. * * * Does the faculty have a voice in university affairs? The measure of democracy in a faculty is the measure of the freedom of a faculty member in his own work, in the job he is paid to do * * *. As to the committees I feel that these should be made up of people who are experts in the field under discussion. You cannot pool ignorance and come out with knowledge." The imputation that the A.A.U.P.'s advocacy of faculty participation in university affairs was improper, that it indicated dissension on the campus, that the freedom of a faculty member should be confined (contrary to the A.A.U.P. theory) "to the job he is paid to do," the implications implicit in the statement that "you cannot pool ignorance and come out with knowledge," could with reason be considered an attack on A.A.U.P. Whether it was unfair or unjustified or unwarranted might be largely a matter of opinion. The high standing of the association is indicated in the university's official recognition of it as described in footnote 2. The faculty members attending the A.A.U.P. meeting and hearing the statement made by Dr. Richardson presumably had for the most part attended the faculty meeting that afternoon and heard the address by President Stout. They could not be misled as by an untrue statement and could not have considered Dr. Richardson's statement other than as the statement of an opinion. His hearers may have agreed or disagreed with that opinion. It is apparent that seven or eight at least disagreed. Faculty participation in university academic matters was not only an objective of A.A.U.P., it was

part of the expressed policy of the University of Nevada at the time. But assuming for the sake of argument that there was·some degree of impropriety or lack of taste in Dr. Richardson's remarks in opening the A.A.U.P. meeting, we have no hesitancy in concluding, in view of Dr. Richardson's history and record at the university, that it did not of and in itself constitute cause for removal.

The entire basis of the claim of insubordination would appear to be not merely the distribution of the Bestor article but its alleged purpose to attack the department of education of the University of Nevada and to attack the president. As against this, petitioner steadfastly asserted that his purpose in distributing the article was not to attack either or to attack anybody, but to substantiate the·proposition that entrance requirements were important and that they directly involved the petitioner as head of the department of biology and the students in his classes. Before discussing this in detail it is important to note that at the time of the distribution of the article the matter of entrance requirements was an open question. It had been a question involving not only much discussion and consideration but involving action by the board of regents on more than one occasion. Prior to 1946 matriculation into the university had depended on meeting requirements both as to courses taken in the secondary schools and as to grades received in those courses. Witnesses referred to these as subject matter requirements and quality credit requirements. For a period of time these requirements were officially relaxed, and from 1946 to 1950 graduates of Nevada high schools were admitted to the University of Nevada simply by virtue of their graduation certificates and recommendation of the high school principals and without regard to courses taken or grades made' in those courses. The results apparently proved unsatisfactory. A poll was taken of the principals of the high schools in the state as to their reaction to such system. This poll was apparently, so far as appears in the record

in this case, the only research made locally upon the question, and it showed overwhelmingly that the secondary school administrators favored the re-establishment of entrance requirements.[3]    By official action such requirements were re-established and were in effect at the time Dr. Stout became president of the university on August 1, 1952.   Dr. Stout's address to A.A.U.P. on October 15, 1952, left the matter open, and suggested the expression of other views contrary to his own if further research developed the same.[4]   To this situation must be added the fact that the university's declaration of policy, which had the approval of the president and the board of regents and was duly reported to the governor, establishing the rights of members of the faculty in determining fundamental educational policy, was still in effect.[5]    It was under these circumstances that Dr. Richardson, a member of the faculty for eleven years, head of the biology department at the time, a member of the faculty welfare committee, president of the local

---

[3]The vote of the high school principals:   11 to 3;  the vote of the high school teachers:   178 to 9.

[4]The secretary of A.A.U.P. at the time of this meeting, read the minutes thereof, which read in part as follows:  "Professor Little then introduced university President Stout, who spoke on the subject of THE NEW SECONDARY SCHOOL AND ITS IMPACT UPON THE UNIVERSITY.   Following President Stout's talk was a considerable and varied discussion in which most of the members brought up questions on admissions, policies, standards, finances, and other matters suggested by his talk.  President Stout suggested a re-examination of current policies and attitudes on these problems.   Indications were that discussion would continue after the end of the meeting.   The meeting was adjourned at 9:50 P.M."

[5]Under date of November 13, 1950, under title "Ideas and Suggestions Concerning Policy and Principle," Dr. Malcolm A. Love, then president of the university, said among other things:

"The faculty, through its organization and within the limitations prescribed by the constitution and laws of the State and the rules and regulations of the Board of Regents, representing the people of the State, should determine the fundamental educational policy of the University."

"*   *   *   All ideas, whether critical or constructive, must be considered on their merits, without reference to their source.  While minorities must never become pressure groups stressing their own

chapter of American Association of University Professors, chairman of the scholastic standing committee, and the recipient of other honors, distributed about thirty copies of Dr. Bestor's article about November 11 or 12, 1952, including a copy to President Stout.

The case in chief against Dr. Richardson in support of the charge of insubordination was opened by the presentation as witnesses, of the dean of the College of Arts and Sciences, the chairman of the Department of Physical Education and professor of physical education on the campus, a teacher in the physical education department, the dean of the College of Engineering, the dean of women, a professor of mining and metallurgy, Mackay School of Mines, a professor of journalism and a professor of history and political science. All of these members of the faculty testified in effect that their reaction to receipt of the Bestor article was that it was an attack upon professors of education and an attack on President Stout.[6] To each copy of the article distributed was attached a brief typed note by Dr. Richardson. One read: "I thought you might enjoy this article

interests as opposed to the welfare of all, neither should they be disinherited and thereby lose their interest in the larger welfare of the University. We hope there will be a different representation in every minority. No person should find it necessary or advantageous to concentrate on ways and means of satisfying his own individual interests. These minority groups should be encouraged in their study to test and refine group thought and expression."
The foregoing was formally approved by the board of regents December 2, 1950.

[6] The introductory note in the August, 1952, Scientific Monthly concerning the author of "Aimlessness in Education" reads as follows: "Dr. Bestor (Ph.D., Yale, 1938) speaks, in the article below, from long experience. Beginning at Yale as an instructor in history in 1931, he has taught and lectured widely ever since. He was at Columbia and Teachers College in 1936, at Stanford from 1942 to 1946, a Newberry fellow at Chicago's famous Newberry Library in 1946, and at the University of Wisconsin in 1947. He has been in the Department of History of the University of Illinois since then. He was made a member of the Committee on American Civilization of the American Council of Learned Societies in 1950." The article contains a page or more of introductory matter defining the Jeffersonian concept of education as the kind that results in the spread of information and the diffusion of knowledge, that

if you may not have already read it. It seems excellent to me, and perhaps very timely. Frank R." Some of the others varied from this form but were to the same general effect. The witnesses explained their reaction in various ways. One thought it was an attack on the

makes the people enlightened and informs their discretion and emphasizes the necessity for "a command of written English, mathematics, science, history and the other disciplines" necessary alike whether or not the high school students concerned intend to go to college. The first major part of the article then deals with the situation under which the author claims that American educators are deliberately and consciously cutting the public schools loose from these disciplines, substituting in their place sundry courses which the author describes as "trivia." The situation in the Illinois secondary school curriculum program is dealt with at length as an example supporting the author's views. Dr. Bestor then purports to show similar inroads into college curricula, citing Michigan as an example. Typical of his expressions is that the "professional educators * * * propose to train citizens to cope with the vast technical questions that are posed by science, by an intricate industrial system * * * [by providing that] after nine full years of formal schooling a student need not be expected to read his native language or to know the multiplication table, and in college he is doing well if he can 'read long numbers and * * * round them off.'" The rest of the article is devoted to the contention that "these preposterous ideas" originated and are being propagated by three groups (1) professors of education in universities, colleges, teachers colleges and normal schools, (2) school superintendents. principals and other local administrators and (3) state and federal officials and bureaucrats. "* * * an interlocking public school directorate * * * of professional educators." The part of the article quoted by counsel in their briefs, read to the court during oral argument, and used in questions propounded to witnesses at the hearing, and evidently considered by the respondents as the extreme example of the author's attack upon the president of the university as a "professional educator" reads as follows: "Professors of education have failed—nay, have refused—to do any of these things. [to develop curricula more thorough and rigorous than those of the slipshod past; to stimulate and encourage rising standards of disciplined training; to advance the ideals of liberal education, etc.] There are honorable exceptions, of course. But, by and large, professors of education have never undertaken to transmit to the public school bureaucracy the considered educational views of their scholarly and scientific colleagues. Instead they have arrogated to themselves the sole right to speak, in the name of the university, on matters of public school policy. They have used the prestige of the university not to advance but to undermine science and learning in the schools. And they subject to personal

president because the article attacked professional educators and the president was such. One thought it attacked President Stout because if there was anything else about the university, except President Stout's advent, that was "timely," it eluded him. President Stout considered it an attack upon the education department of the university. The record nowhere contains any statement by Dr. Stout that he considered the article an attack upon him, nor do the findings of the regents include any finding to such effect. The director of the school of education, holding, like President Stout, a doctor of education degree, felt "some concern about the article," went to see Dr. Richardson, convinced him that there were some weaknesses in the article and was quite convinced "that this article was not meant to attack schools of education or professors of education" and was "quite thoroughly convinced" that there was no intent to reflect on his department. It was passed around among the other members of his department, was discussed briefly, but caused no great disturbance. He testified: "* * * the general consensus was that he had not meant to hurt me or my department * * *." The article made the professor of physical education "[wonder] why [Dr. Richardson] wasn't taking care of

vituperation any colleague in the liberal arts who ventures to protest. In their eyes a lifetime of teaching cannot make a scholar or scientist anything but a meddlesome amateur when public educational policy is up for discussion." Criticisms of Dr. Bestor's article, appearing in a later issue of The Scientific Monthly, and which Dr. Richardson characterized as being fair criticism, and to which he frankly called attention, were to the effect that the article implied that *all* public schools had fallen prey to the progressive system, that the article as a whole seemed "a caricature unsuitable for publication in a scientific journal"; that "as a matter of good taste, one might call into question the author's use of invective, irony, sarcasm and name-calling"; that it is "naive to believe" that the task of education "can be carried out successfully by the application of any simple formula, however time-honored"; that Dr. Bestor is presumptuous when he asserts that the "iron curtain" stretching across the educational world was "fashioned by educators," but that on the contrary the professors of the academic subjects, completely immersed in their respective fields, are likewise largely responsible.

his own business." He threw the Bestor article in the wastebasket. He was of the "definite opinion that Dr. Richardson should not concern himself as a member of the faculty or as a member of the scholastic standing committee with any of these admission questions and * * * with reference to university policy, with educational policy." The teacher in the physical education department thought the article attacked the president "because he is trained to do the job he is hired for." She threw it in the wastebasket. One, in reading the article, "never went on beyond about the third paragraph." One "didn't think the article was of quality sufficient to resent it. I took it home to think about it longer and later burned it." One thought the Bestor article "rather a ranting sort of an attack on people in the field of education." Dr. Richardson frankly conceded that it was "one-sided." He volunteered to send out the Reeder article, an article taking the opposite view but the head of the education department thought best not to do so. He also called attention to other comments on the Bestor article, some approving and some disapproving the same. Criticisms of the Bestor article were characterized by Dr. Richardson as seeming pretty fair. During all of this period the relations between the department of education and Dr. Richardson's department of biology were just as fine as the biology department's relations with mathematics, history or any other department. The education department head recognized that there was considerable controversy and room for difference of opinion on the question of admission requirements.

It might be noted at this point that the minutes of the A.A.U.P. meeting of November 19, 1952, contained the following: "Professor Richardson referred the members to an article by Reeder in the A.A.U.P. bulletin, autumn, 1951, which presented an opposing view to that of Professor Bestor entitled 'Aimlessness in education,' copies of which Professor Richardson had circulated to various members of the faculty."

The regents introduced in evidence two letters written by the dean of students of Stanford University. These letters appear to be a sincere, fair and objective attempt to evaluate the effects of eliminating the subject matter and quality credit requirements for entrance to the university and to explain the difference in applying the requirement or lack of requirement for such credits to a state university and to a privately endowed university. To us the main importance of these letters lies in the repeated acknowledgment that the question is a controversial one. The dean wrote: "There are marked differences of opinion among reputable educators, and there are marked differences among educational institutions." Again: "It is such a complex matter and has so many ramifications that I hesitate to say anything about it, since it obviously is not possible to treat exhaustively all the facets of the question."

The dean of the College of Engineering was called as a witness for the regents and testified that he considered "the Bestor article an attack on education and educators" and stopped reading it after he read about the third paragraph. On cross examination, although he said it was difficult to say that the better background a student had the better work he would do in the College of Engineering (because some students with brilliant minds come from small schools and because every student is an individual and his performance at the university must sometimes measure his intelligence), he nevertheless testified very significantly as follows: "Q. Do I understand your testimony to be that it is immaterial to you what training a high school student has as a foundation for admission to the College of Engineering? A. You are entirely incorrect in that assumption. Q. What is your position on that? A. I believe that High School students should just as far as possible prepare themselves in mathematics, physics, chemistry, English."

The dean of the College of the Arts and Sciences (the immediate superior of Dr. Richardson as head of the

department of biology) was likewise called by the regents and testified that his reaction when he read the Bestor article was that he thought it was an attack upon the president. But as to the note attached to the article to the effect that it seemed timely, he testified: "Well, I thought it was indicated by Dr. Richardson that it was timely *because we were discussing admission requirements at that time. The president had asked the admissions committee to discuss admission requirements,* and it was, in my opinion, timely because this was a good time to attack the president." In our view, in the light of the entire record, the italicized words (which italics we have added) more reasonably indicate the "timeliness."

On cross examination the dean was asked: "Q. Then you, yourself, are personally interested in a professional way in the subject of admission requirements, are you not? A. Oh, certainly." Later he testified: "Dr. Richardson had already said to me that he was very much concerned about the proposals of the president concerning admission. I assume—. Q. He told you he was much concerned about them, is that correct? A. That's right, he said in these words, 'I'm worried about the way things are going around here.' Q. And didn't you reply that you were somewhat concerned too? A. Oh, I may have. It happens to be my business to be concerned about such things."

The important ultimate facts drawn from the foregoing recitals would appear to be:

1. That at the time Dr. Richardson distributed the Bestor article the question of admission requirements was an open one. Frank and open discussion by any member of the faculty was in order—whether such views were in favor of relaxing the requirements, as advocated by President Stout, or in favor of continuing in effect the present requirements.

2. The distribution of the Bestor article was an expression of views on this subject.

3. Some eight members of the faculty thought that

the article was likewise an attack upon the University Department of Education and upon President Stout. Dr. Richardson did not consider it so and used all reasonable efforts to placate persons who did. He frankly conceded that criticisms of the Bestor article were to some extent well taken and offered to distribute an article advocating an opposite position.

4. No disruption of the faculty resulted. The persons who thought it an attack on the president or on the department of education or on professional educators in general took no action, did not remonstrate with Dr. Richardson, did not report it to President Stout, for the most part either threw it in the wastebasket or made other casual disposition of it. A copy was sent by Dr. Richardson to President Stout with a friendly message.

5. Many members of the faculty did not consider the article to be either an attack on the president or on the department of education. The head of the department of education did not consider it such after he talked to Dr. Richardson about it. One of the professors who appeared as a witness for the regents wrote Dr. Richardson a rather commendatory letter concerning the article.

6. At the time the article was distributed by Dr. Richardson there was in effect no order of the regents, no order of the president, no rule, no regulation of any kind whatsoever that was violated. On the contrary there was still in effect the declaration of policy issued by a former president and approved by the regents approving faculty participation in academic matters. There was still in effect the president's invitation to present views contrary to his.

7. Two of the main witnesses called by the regents admitted frankly that the question of admission requirements was of interest to them. It can reasonably be presumed that many other faculty members would have said the same.

Under these circumstances it is difficult to find support of a charge of insubordination. From the many definitions found in the cases we may say without

greater elaboration that "insubordination" imports a willful disregard of express or implied directions, or such a defiant attitude as to be equivalent thereto. "Rebellious," "mutinous," and "disobedient" are often quoted as definitions or synonyms of "insubordinate." Refinements that deal with the authority of the superior officer to promulgate the order or with the reasonableness of the order in question need not be considered.

It is appropriate to note here that the petitioner's opening brief challenged respondents to show support in the record of the findings of the regents that petitioner had been guilty of insubordination and had refused to cooperate, or showed support for the order discharging petitioner for said reasons. In response to this challenge respondents' brief, under the main title of "Evidence in Support of Order," treats the matter under five subheadings. The last three may be quickly disposed of. Subheading C deals with the question of petitioner's alleged false accusation that a certain professor had threatened a student with loss of the latter's job by reason of an article written by him in a university publication. This, as noted above, we have dismissed as trivial. Even if the item had significance, the hearsay and gossipy nature of the reported incident leaves it entirely unimpressive. Subheading D refers generally to petitioner's opposition to relaxing the admission requirements. Subheading E is a general statement in summary. We are left with subheading A, which covers the distribution of the Bestor article, and subheading B, which covers petitioner's statement that the president had made an unfair and unjustified attack on A.A.U.P.

The court is justified in feeling that the respondents were thus presenting their strongest case in justifying the two findings of insubordination and lack of cooperation, in support of the conclusion that these constituted cause for removal, and in support of the order discharging the petitioner from the faculty. With full recognition of the right of the regents to weigh the evidence, to resolve conflicts in such evidence, to pass upon the

credibility of the witnesses, to commit procedural errors not going to the jurisdiction, and to be the finders of facts relevant to the issues, the observations made in this opinion inevitably point to the conclusion that the record presents no substantial support of either the finding of insubordination or the finding of lack of cooperation and presents no cause for removal. Its order of June 9, 1953, removing 'petitioner as a member of the faculty of the University of Nevada must therefore be vacated. It is so ordered.

EATHER, C. J., and MERRILL, J., concur.