In re Petition for a WRIT OF PROHIBITION or in the Alternative for a WRIT OF MANDAMUS.

THE HONORABLE JERRY CARR WHITEHEAD, Petitioner, *v.* NEVADA COMMISSION ON JUDICIAL DISCIPLINE, Respondent.

No. 24598

February 18, 1994 869 P.2d 795

[Rehearing denied April 22, 1994]

*Ohlson & Springgate,* Reno; *Hamilton & Lynch,* Reno; *Gentile, Porter & Kelesis,* Las Vegas; *Laura Wightman FitzSimmons,* Las Vegas, for Petitioner.

*Frankie Sue Del Papa,* Attorney General, *Brooke Nielsen,* Deputy Attorney General, Carson City; *Donald J. Campbell,* Las Vegas, for Respondent.

## OPINION

By the Court, ZENOFF, SR. J.:

### STATEMENT OF THE CASE

This opinion is written to explain certain actions this court has already taken in these proceedings, which commenced when a District Court judge on July 22, 1993, filed an original petition for a writ of mandamus, or alternatively for prohibition, directed to the Nevada Commission on Judicial Discipline. Our constitutional authority to entertain writs of the kind requested is set forth in article 6 of the Nevada Constitution (the title of which reflects that its purpose is to establish a "Judicial Department") as follows:

> *The supreme court shall have appellate jurisdiction in all civil cases arising in district courts,* and also on questions of law alone in all criminal cases in which the offense charged is within the original jurisdiction of the district courts. *The court shall also have power to issue writs of **mandamus**, **certiorari**, prohibition, **quo warranto**, and **habeas corpus***

*and also all writs necessary or proper to the complete exercise of its appellate jurisdiction. . . .*

Nev. Const. art. 6, § 4 (emphasis added).[1]

The Discipline Commission was created in 1976 by an amendment to the mentioned "Judicial Department" article of our constitution that inserts into article 6 a new section 21, which not only creates the Commission but also grants this court certain powers over it. In very broad terms, section 21(1) recognizes that the Supreme Court, theretofore also created by the "Judicial Department" article, is to have appellate jurisdiction over the Commission, as it does over Nevada's District Courts:

> 1. A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. *A justice or judge may appeal from the action of the commission to the supreme court, which may reverse such action or take any alternative action provided in this section.*

(Emphasis added.)[2] Section 21(5) of article 6, in addition, vests the Supreme Court with power to promulgate rules for the governance of the Commission, as it does for the District Courts:

> 5. The supreme court shall make appropriate rules for:
> (a) *The confidentiality of all proceedings before the com-*

---

[1] It should be noticed immediately that this constitutional passage does not by its terms limit this court to issuing writs of *mandamus, certiorari, prohibition, quo warranto* and *habeas corpus* solely "to complete the exercise of its appellate jurisdiction." Instead, article 6, section 4, initially grants this court unrestricted authority to issue those enumerated writs without any limitation, after which section 4 follows with the words, "*and also all writs* necessary or proper to the complete exercise of its *appellate* jurisdiction." (Emphasis added.) This is expansive language, not restrictive language as a phrase such as "and other writs necessary to complete the exercise of its appellate jurisdiction" would be. Accordingly, as will hereafter be demonstrated, in past decisions this court has used mandamus, certiorari, prohibition, quo warranto and habeas corpus to correct improper activities of constitutionally-created officers outside the judicial branch of Nevada government. Likewise, as concerns the other tribunals in the judicial branch (such as Justice, Municipal and District Courts), the use of the writs of mandamus, certiorari, prohibition, quo warranto and habeas corpus has never been confined merely to complete this court's "appellate jurisdiction" in the narrow sense of that term.

[2] It should be noted that this passage simply establishes explicitly that an accused judge has an absolute right to seek review of final Commission decisions by way of appeal. By its terms, section 21(1) in no way undertakes to state a limitation on the authority granted elsewhere in the constitution for this court to issue traditional, discretionary writs.

*mission, except a decision to censure, retire or remove a justice or judge.*
(b) *The grounds of censure.*
(c) *The conduct of investigations and hearings.*

(Emphasis added.)

The premise underlying the petition for relief herein is that by multiple violations of the provisions of the new set of rules that this court promulgated in 1988, pursuant to the above-quoted constitutional mandate, the Commission and attorneys acting in its name have exceeded the lawful scope of the Commission's jurisdiction as established by the rules in ways that justify our intervention by way of a writ.

When the petition for writ was initially presented last July to the Vice-Chief Justice in chambers, the Vice-Chief Justice temporarily stayed proceedings before the Commission, in order to allow the full court to consider whether violations of the applicable rules had been stated so as to justify our exercise of jurisdiction as requested, and ordered that proceedings before this court be kept confidential, in order to maintain the confidentiality of proceedings before the Commission as mandated by our constitution.

Later, in various orders, other members of this court approved these actions by the Vice-Chief Justice, and ultimately joined with him in ordering a private, *"in camera,"* inspection of the Commission's records so that the court might evaluate whether these records provide support for petitioner's contentions that excesses of the Commission's jurisdiction have occurred which are of a nature as to justify our intervention by way of extraordinary writs.[3]

Orders of this kind directing litigants to deliver materials of possible evidentiary significance to a reviewing court for private or *"in camera"* inspection, as a prudential first step in deciding whether to allow opposing litigants access to any part of such materials, are widely employed in judicial practice. *See, e.g.,* Donrey of Nevada v. Bradshaw, 106 Nev. 630, 798 P.2d 144 (1990) (*in camera* inspection of police reports proper before

---

[3]By virtue of petitioner Whitehead's subsequent waiver of his constitutional right to confidentiality of judicial disciplinary proceedings, the orders mentioned above are now accessible to the public. The public, therefore, can now confirm that, contrary to stories published in some news media to the effect that such orders were signed only by VICE-CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER (pejoratively alluded to as a "minority of the court"), both orders were in fact signed by a majority of the court as then constituted: VICE-CHIEF JUSTICE THOMAS L. STEFFEN, JUSTICE CHARLES E. SPRINGER, and District Judge Addeliar Guy (who was participating in the place of JUSTICE CLIFF YOUNG, who was disqualified).

release to media); Hickey v. District Court, 105 Nev. 729, 782 P.2d 1336 (1989) (*in camera* inspection of juvenile records proper to determine whether they were relevant to litigation); Nicklo v. Peter Pan Playskool, 97 Nev. 73, 624 P.2d 22 (1981) (trial court should have inspected child custody investigator's report *in camera* to determine its relevance to the trial).[4]

Nevada Attorney General Frankie Sue Del Papa, nevertheless, joined by a so-called special prosecutor (whom she has employed with public funds that she obtained from Nevada's State Board of Examiners by acknowledging that she faced a conflict of interest herein),[5] advised the Commission to refuse compliance with our

[4]Nonetheless, some news organizations have portrayed our action as anomalous and unprecedented, a distortion enhanced by also inaccurately reporting that we had ordered the Commission to deliver all of its investigative records directly to petitioner Whitehead rather than to the court.

[5]The Nevada Attorney General is routinely involved in representing and defending this and other Nevada courts in litigation involving challenges to court actions and sometimes claims for money damages against the justices and judges personally, and in providing courts other advice and services on a continuing basis. It follows that any undertaking by the Attorney General to represent the Nevada Commission on Judicial Discipline in contested proceedings (as contrasted with supplying the Commission with abstract advice on an occasional basis) necessarily raises serious prospects of conflict with her regular obligations as a representative and advocate of the courts' legal positions and interests. Consequently, we certainly cannot fault Attorney General Del Papa for advising the Board of Examiners, as she did, that "in the opinion of the Attorney General, representation of the Commission on Judicial Discipline in the matter of Case No. D-163-03/04 (the number by which the Commission identifies the Whitehead proceedings) presents a potential conflict of interest that requires employment of special counsel for those matters." What is less clear to us is why, once this recognized potential of conflict ripened into indubitable actuality through petitioner Whitehead's institution of proceedings in this court, the Attorney General has continued actively to advise and represent the Commission as well as to act as its ostensible spokesperson in deprecatory pronouncements about this court. We note that it was Attorney General Del Papa's continued active involvement in these proceedings that resulted in petitioner Whitehead's motions to challenge our Chief Justice, on grounds that while he was presiding chief justice in these proceedings, Attorney General Del Papa was simultaneously acting as attorney in an inquiry of substantial concern to him personally.

We note that Nevada law does not call for such problems and conflicts. NRS 1.450 does not, as claimed by Attorney General Del Papa, require her to act as the Commission's legal counsel. Instead, NRS 1.450(1) specifies that the Commission may select any counsel it desires, subject, of course, to the implicit limitation that the Commission cannot choose an attorney who is disqualified because of a conflict of interest. NRS 1.450(2) also allows the Commission to ask the attorney general for advice, but, like other attorneys, of course, the attorney general has no right to provide advice or services in circumstances of conflict or impending conflict. *See also* Nev. Const. art. 6, § 21(9)(a).

Routinely, when decisions of this court are challenged in federal court, the attorney general represents the court and its justices. We must question who

orders. Essentially, it is the premise of Attorney General Del Papa, her chief deputy and her special prosecutor[6] that, regardless of any excesses of authority they may have committed or what they may have advised to be done in the Commission's name, this court will remain powerless until such time as their allegedly improper activities some day culminate in a "final" Commission order that censures, removes or retires Judge Whitehead.

By a letter dated October 14, 1993, delivered to the court the following day by Attorney General Del Papa's deputy, this court was told:

> After careful and thoughtful consideration of the Court's many orders including its confidential "order" of October 4, 1993, the Nevada Commission on Judicial Discipline has unanimously reached the following difficult, but constitutionally demanded, decision.

> This Court's "order" of October 4, 1993, calls for the production of material which is statutorily and constitutionally privileged. To comply with this secret "order" would require the Commission to not only waive those privileges, but to betray its constitutional duty to safeguard the collective rights of Nevada's citizens to fair and impartial justice. The Commission cannot in law, nor in good conscience, abandon its constitutional post in the face of an assault by a series of secret, illegal and void "orders." To acquiesce in this most recent attempt to emasculate and usurp the separate constitutional powers of the Commission would violate the oath which each of the undersigned has sworn to fulfill.[7]

---

now would remain to defend our rulings herein if Attorney General Del Papa were to carry through on reported intimations that she may sue us in federal court in the name of the Discipline Commission, which she voluntarily decided to represent notwithstanding her engagement of "special counsel" with public funds. *See* Cy Ryan, *Del Papa may seek federal help with Whitehead case*, Las Vegas Sun, Feb. 1, 1994, at 4C.

[6]Documents presented in this case by the Attorney General have been signed by her chief deputy and her "special prosecutor." For convenience, the mentioned three signators will be referred to collectively as "the Attorney General and associates."

[7]For such interest as the fact may have, we note parenthetically that some time before we received this letter protesting our "secret, illegal and void 'orders,'" the Deputy Attorney General who delivered it had written petitioner Whitehead's counsel another letter stating:

> The Nevada Commission on Judicial Discipline has directed your letter dated June 18, 1993, to me for response. In accordance with Rule 5 of the Administrative and Procedural Rules (hereinafter "ARJD") for the Commission, all proceedings are strictly confidential until the filing of a formal statement of charges occurs. Any breach of this confiden-

From the quoted letter and from other documents submitted to this court, it appears that the Attorney General and associates have been inaccurately advising the Commission's members that, as a separate entity in the structure of Nevada government, the Commission was created as totally independent from any control by anyone in the three established branches of government: executive, legislative and judicial. Hence (according to the stated view of the Attorney General and associates), no action of the Commission, however wrongful or prejudicial, is subject to any control or review whatever, unless and until a "final" order is entered censuring or removing or retiring an aggrieved judge. If such a "final" order is ultimately entered, the Attorney General and associates evidently concede, the aggrieved judge may then appeal to this court to seek correction of harm wrongfully occasioned. Absent such a "final" order, however, as the argument of the Attorney General and associates proceeds, neither this court nor anyone else in Nevada's government has authority to prevent unwarranted intrusions into Nevada's judicial machinery or to forestall impositions on its judges perpetrated by attorneys ostensibly serving the Commission's interests as prosecutors.

In summary, then, it appears that the Attorney General and associates have led the members of the Commission to believe: (1) that this court's orders herein, including our aforementioned orders for *"in camera"* inspection of documents, were void because they were "secret" and because they constituted unwarranted intrusions into the Commission's "constitutional duty"; and (2) that because the orders were void, they should be disobeyed. We have concluded that, out of respect for the Commission and the importance of the purposes for which it was created, such ideas must be explicitly examined and laid to rest as groundwork for proceeding to an orderly disposition of this case.

We therefore intend to explain in this opinion, the bases for this court's authority to direct the Commission to submit certain records to us for our private, *"in camera"* inspection, as we did in a confidential order filed in these proceedings on October 4, 1993, which we later confirmed in another confidential order on October 7, 1993.

As a preface to this explication, however, we should note that

---

tiality requirement is punishable as a contempt of the Nevada Supreme Court.

We are therefore unsure at what point in time the Attorney General and associates developed the abhorrence for "secrecy" expressed in the letter later delivered to us and quoted above in the text of this opinion; nor do we know when it was they decided this court had no authority to enforce the confidentiality rule, ARJD 5.

even if this court's orders to permit our *"in camera"* inspection of documents were indeed "void," as the Attorney General and associates evidently have led the Commission to believe, the Attorney General's advising the Commissioners simply to defy those orders would, nonetheless, have been questionable advice. From the filed briefs herein it appears that the Attorney General and associates may be insufficiently acquainted with the legal precedents relating to the "jurisdiction to determine jurisdiction" doctrine. This doctrine relates to the long-recognized authority of courts to issue ancillary orders while considering other questions (*including* determination of their own jurisdiction), and to punish as criminal contempt violations of such orders even though it may later be judicially determined that the court lacked jurisdiction over the proceedings in which the ancillary orders were issued. For example, the Attorney General and associates suggest in their briefs that United States v. United Mine Workers of America, 330 U.S. 258 (1947), holds that "when a court goes outside its jurisdiction and acts as a usurper, such orders are void and may be disobeyed with impunity." This statement mischaracterizes the holding of the *Mine Workers* case and distorts the significance of its holding and other decisions of the same genre in regard to the case at bar.

In *Mine Workers,* a federal district court, without notice, had entered a temporary restraining order enjoining the defendant union and its president from encouraging mine workers to strike. *Id.* at 266-67. The defendants defied the order, and the United States Government pursued contempt proceedings before the district court. *Id.* at 267. In response, the miners contended that the Norris-LaGuardia Act provided no jurisdiction for the district court to proceed against them; hence, they claimed, the restraining order had been void. *Id.* at 269. The district court nonetheless imposed very substantial civil and criminal sanctions against the defendant union and its president, which the United States Supreme Court subsequently upheld. *Id.* at 289.

In a decision often cited to illustrate the "jurisdiction to determine jurisdiction" doctrine, the High Court said in *Mine Workers* that even if the Norris-LaGuardia Act had not vested the district court with jurisdiction, there would have been "alternative grounds which support the power of the District Court to punish violations of its orders as criminal contempt." *Id.* at 289. The Court went on to cite Howat v. Kansas, 258 U.S. 181, 189-90 (1922), as authority for the proposition that an injunction issued by a court of general jurisdiction *must* be obeyed, however improper the action of the court may be, even if the error be the assumption of the validity of a void law going to the merits of the

case. *Mine Workers*, 330 U.S. at 292-93. Quoting *Howat*, the High Court stated:

> It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.

*Id.* at 294 (quoting *Howat*, 258 U.S. at 189-90).

In like manner, as in *Howat* and in the other cases discussed above, it was for this court and not the Attorney General and associates to decide whether ARJD 40(7) provides this court with jurisdiction to consider a petition seeking interlocutory relief from Discipline Commission action. Furthermore, as in *Mine Workers*, our jurisdiction temporarily to restrain Commission action while conducting our review cannot be doubted. *Mine Workers* teaches that even if a stay or restraining order was entered in a proceeding over which the lower tribunal lacked jurisdiction, it may still be enforced under the "jurisdiction to determine jurisdiction" doctrine. *See Mine Workers*, 330 U.S. at 292. Thus, in the case now before us, assuming that the Commission and the Attorney General could persuade the United States Supreme Court to grant certiorari, under the holding in *Mine Workers*, they could not hope to gain relief from a judgment for contempt (if we entered one now), unless they could persuade the High Court that they had no opportunity to apply for relief in this court, *before defying our order.* Otherwise, the asserted fact that our undertaking interlocutory relief was wrong would make no difference. *See* Walker v. City of Birmingham, 388 U.S. 307 (1967) (Dr. Martin Luther King, Jr.'s conviction for contempt upheld, for violating restraining order, preventing civil rights march, regardless of whether ordinance enforced by the order was offensive to Federal Constitutional rights); *cf.* Shuttlesworth v. Birmingham, 394 U.S. 147 (1969) (vacating, on certiorari, the conviction of a minister who accompanied Dr. King in the same civil rights march, and who did not violate the lower court's order but only a facially unconstitutional ordinance that violated his First Amendment rights). To gain relief, the Attorney General and associates would, in addition, have to satisfy the High Court that this court's interpretation of the Nevada Constitution and the rules promulgated pursuant thereto was not only wrong in its assuming jurisdiction in this court, but also that it impacted adversely on Commission members' rights that are protected

under the Federal Constitution (an undertaking with dubious prospects of success).

The holdings of *Walker* and *Shuttlesworth,* therefore, do not support the position that the Attorney General and associates have counseled the Commission members to take in this matter. Like Dr. King in the *Walker* case, the Attorney General and associates did not provide this court a meaningful opportunity to vacate its October 4, 1993, order for *"in camera"* inspection before having counseled the Commission to defy the order as void. They submitted only a vague, one and one-half page motion, for a thirty-day extension of time, that was denied. Then, on October 12, 1993, they filed a motion seeking reconsideration and a stay of the court's order of October 4, 1993. The motion also requested oral argument. Three days later, one day past the date for compliance established by our order of October 4, 1993, the Commissioners tendered their letter, dated October 14, 1993, indicating their intention to defy this court's order.[8] Thus, it appears that they placed the members of the Commission in exactly the same position as was Dr. King in the *Walker* case. The Commission members did more than simply violate the rules of this court upon which the order of *"in camera"* inspection was predicated; thus, they are not in the position of Dr. King's colleague in *Shuttlesworth.* Therefore, under the general principles of the "jurisdiction to determine jurisdiction" doctrine, as recognized in *Mine Workers* and *Walker,* the Attorney General and associates have rendered themselves subject to an adjudication of contempt and appropriate sanctions for contempt.

---

[8]The Attorney General and associates filed the mentioned motion for reconsideration and stay only two days before they counseled the members of the Commission to sign and issue the October 14, 1993, letter signifying the refusal by each signing Commission member to obey and comply with the discovery order of this court. Under NRAP 27 the time for petitioner Whitehead to file a response in opposition to the motion had not expired. Prior to counseling Commission members to defy this court's order, the Attorney General and associates made no effort to expedite a decision on the motion or to call the court's immediate attention to the motion prior to issuance of the letter refusing to comply with the discovery order. It appears that the Attorney General and associates had more than ample opportunity to apply for and obtain an emergency ruling on this motion for reconsideration. Rather than take this opportunity, however, the Attorney General and associates evidently opted to prepare the October 14 letter by which the Commission members categorically refused to obey the order of the court regardless of whether or not the court granted the relief requested in the motion. Under such circumstances, the motion for reconsideration appears to be a mere pretext, rather than a bona fide application for relief from this court.

The United States Supreme Court has already specifically considered the peculiar problem faced by a lawyer who believes in good faith that a court directive to produce documents is unduly burdensome or otherwise unlawful. In such a case, subject to the obligation to apply first for relief to the court that issued the discovery order (*see Walker, supra*), the party and the party's lawyer may, at their peril, defy the order while seeking relief in a higher court. Once the jurisdictional contentions have been presented to and rejected by the lower court, they are preserved for review. If on appeal (or certiorari) the contentions are upheld, any contempt adjudication will fall. In United States v. Ryan, 402 U.S. 530 (1971), which involved this fact pattern, the High Court stated:

> Walker v. Birmingham . . . is not to the contrary. Our holding that claims there sought to be asserted were not open on review of petitioners' contempt conviction was based upon the availability of review of those claims at an earlier stage.

*Id.* at 532 n.4. Thereafter, if they later persuade a higher court (in the instant case, the United States Supreme Court) that the order was entered without jurisdiction (and that they had adequately brought its void character to the attention of the lower court before defying it) the appellate court may vacate any contempt judgment. *See also* Maness v. Meyers, 419 U.S. 449 (1975).[9]

---

[9]*Maness v. Meyers* was a case holding that a lawyer may not be held in criminal contempt for advising his client, a defendant in a state civil case, not to comply with a subpoena *duces tecum* that the court refused to quash, or with the court's follow-up order to comply, when the lawyer believed reasonably and in good faith that compliance might tend to incriminate his client in violation of the Fifth Amendment.

In the course of decision, the Court discussed the duty of the client to obey court orders. It began with the "basic proposition" that the "orderly and expeditious administration of justice by the courts requires" the client to comply with all court orders and then pursue review thereof. *Maness,* 419 at 458-59.

> Remedies for judicial error may be cumbersome but the injury flowing from an error generally is not irreparable . . . .
> When a court during trial orders a witness to reveal information, however, a different situation may be presented. Compliance could cause irreparable injury because appellate courts cannot always "unring the bell" once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing the error.

*Id.* at 460. So in *Maness,* although eventual review of the Fifth Amendment contention might be possible, there was no regular opportunity to review for compliance. And compliance could have constituted irreparable injury. Thus, the client could refuse to comply, and then raise his constitutional contention in any consequent contempt proceedings; if his contention were eventually upheld, any contempt adjudication would then fall.

The fundamental legal difficulties with the position in which the Commission members have been placed, therefore, are: (1) that following entry of our order of October 4, 1993, and prior to defying it, the Commission did not provide this court with a meaningful opportunity to consider intelligibly any arguments, or any opposition to the arguments, claiming that the order was void[10]; and (2) that no good faith effort was made to seek relief in a higher court. We therefore believe that, assuming that the High Court would now (always a doubtful prospect) grant certiorari if we proceeded immediately to contempt proceedings in this matter, it is highly unlikely that the Court would vacate any judgment for contempt that we might now enter.

None of the legal authorities tendered by the Attorney General and associates has any significance to persuade us to the contrary. For example, counsel place great reliance on NRS 22.010, which lists some acts or omissions that Nevada courts may consider as constituting contempt, and which counsel suggest does not encompass the defiance they have counseled. As one of the matters that may be deemed to be contempt, NRS 22.010(3) enumerates: "Disobedience or resistance to any *lawful* writ, order, rule or process issued by a court or a judge at chambers." (Emphasis added.) The Attorney General and associates appear to find great comfort in the fact that the statute states that the order defied must be "lawful." They ignore the fact that under decisions of the United States Supreme Court cited above, our orders have been lawful under the "jurisdiction to determine jurisdiction" doctrine, even if it should be ultimately decided federally that jurisdiction in this matter should be rejected or denied. Considered in this light, NRS 22.010, therefore, does not support the advice given to the Commission members, but, rather, is contrary to it.

*Ex parte George*, 371 U.S. 72 (1962), on which the Attorney General and associates also place great reliance, is a brief *per curiam* opinion decided five years before *Walker v. City of Birmingham, supra,* and it is based on distinguishable reasoning. Essentially, what the High Court held in *Ex parte George* was that, in view of the Texas appellate court's recognition of Texas law (which provided that a person cannot be punished for contempt for violating a temporary injunction granted by a court without jurisdiction), a Texas district court's imposition of a contempt sanction was improper because the NLRA precluded the district court's subject matter jurisdiction. The case thus

---

[10]As noted, however, the Commission's motion for reconsideration was filed on October 12, 1993.

clearly turns on a Texas interpretation of Texas law. "Under Texas law one may not be punished for contempt for violating a temporary injunction, as here, granted by a court having no jurisdiction of the subject matter." 371 U.S. at 73 (citations omitted). Thus the application of the "jurisdiction to determine jurisdiction" doctrine would not have been appropriate in the *Ex parte George* case, which in any event antedated all the major, meaningful authorities we have discussed above.[11]

In view of what has been said, it should be clear that if we desired to do so, we might successfully proceed immediately to address apparent defiance of our prior orders as contempt of court without pausing to explain the validity of those orders further. However, viewing the members of the Commission as conscientious and reasonable persons who are donating their energies with worthwhile social ends in view, we will not immediately treat the acts of resistance (which the Attorney General and associates appear to have counseled) as actionable contempt on the part of any Commission member. We feel obliged, instead, to explain why we have deemed our orders for *"in camera"* inspection of Commission records (as well as all other orders heretofore entered) not to be void but, rather, within this court's legitimate jurisdiction. We will, therefore, regard the Commission's above-quoted letter of October 14, 1993, as a request for reconsideration of the court's implicit determination of jurisdiction upon which the subject orders were based; hence, this opinion is issued.

### EXPLICATION OF THE COURT'S JURISDICTION

1. In 1976, Nevada citizens voted to amend article 6 of the Nevada Constitution, entitled "Judicial Department," to include therein a new section 21 that established a Nevada Commission on Judicial Discipline.[12] From the examination of our Constitu-

---

[11]A fairly recent United States Circuit Court decision of interest is *In re Providence Journal Co.* which declares that a newspaper may be punished for criminal contempt for defying a court order later determined to be improper for lack of jurisdiction, even though the order was transparently invalid. 820 F.2d 1354 (1st Cir. 1987) *(en banc), cert. dismissed sub nom,* United States v. Providence Journal Co., 485 U.S. 693 (1988).

[12]Article 6, section 21, provides as follows:

Sec. 21. Commission on judicial discipline.

1. A justice of the supreme court or a district judge may, in addition to the provision of article 7 for impeachment, be censured, retired or removed by the commission on judicial discipline. A justice or judge may appeal from the action of the commission to the supreme

tion's "Judicial Department" article, it is evident that jurisdiction to define what actions the Commission has the power to sanction as judicial misconduct reposes in the *Supreme Court* of Nevada, rather than in the Commission. The Constitution plainly declares that the Supreme Court shall make appropriate rules for: *"The grounds* of censure." Nev. Const. art. 6, § 21(5)(b) (emphasis added). The Constitution does not suggest or infer that the Commission shares this power in any way whatsoever.

---

court, which may reverse such action or take any alternative action provided in this subsection.

2. The commission is composed of:

(a) Two justices or judges appointed by the supreme court;

(b) Two members of the State Bar of Nevada, a public corporation created by statute, appointed by its board of governors; and

(c) Three persons, not members of the legal profession, appointed by the governor.

The commission shall elect a chairman from among its three lay members.

3. If at any time the State Bar of Nevada ceases to exist as a public corporation or ceases to include all attorneys admitted to practice before the courts of this state, the legislature shall provide by law, or if it fails to do so the court shall provide by rule, for the appointment of attorneys at law to the positions designated in this section to be occupied by members of the State Bar of Nevada.

4. The term of office of each appointive member of the commission, except the first members, is 4 years. Each appointing authority shall appoint one of the members first appointed for a term of 2 years. If a vacancy occurs, the appointing authority shall fill the vacancy for the unexpired term. An appointing authority shall not appoint more than one resident of any county. The governor shall not appoint more than two members of the same political party. No member may be a member of a commission on judicial selection.

5. *The supreme court shall make appropriate rules for:*

*(a) The confidentiality of all proceedings before the commission, except a decision to censure, retire or remove a justice or judge.*

*(b) The grounds of censure.*

*(c) The conduct of investigations and hearings.*

6. No justice or judge may by virtue of this section be:

(a) Removed except for willful misconduct, willful or persistent failure to perform the duties of his office or habitual intemperance; or

(b) Retired except for advanced age which interferes with the proper performance of his [or her] judicial duties, or for mental or physical disability which prevents the proper performance of his [or her] judicial duties and which is likely to be permanent in nature.

7. Any person may bring to the attention of the commission any matter relating to the fitness of a justice or judge. The commission shall, after preliminary investigation, dismiss the matter or order a hearing to be held before it. If a hearing is ordered, a statement of the matter shall be served upon the justice or judge against whom the proceeding is brought. The commission in its discretion may suspend a justice or judge from the exercise of his [or her] office pending the determination of the proceedings before the commission. Any justice or

As a legal corollary, the Commission, therefore, would be acting in excess of its jurisdiction at any time it might undertake to sanction, as misconduct, any judicial behavior that has not been proscribed definitively by either the rules adopted for the Commission by this court pursuant to its constitutional mandate, Nevada criminal law[13] or the Nevada Constitution. The Constitution simply does not contemplate that the Commission members may define "judicial misconduct" for themselves based on their own *ad hoc* judgments concerning what conduct is desirable. To condone such a practice would not merely offend the Constitution's letter but its underlying policy. Judges could be rendered subject to censure and to removal from office without any fair prior notice that actions questioned by the Commission might be treated as wrongful. Judges could be subjected to discipline based on whatever notions of propriety might be harbored by the Commission's shifting membership at any given time. We should hasten to mention that this court thus far has issued no writ, and it

---

judge whose removal is sought is liable to indictment and punishment according to law. A justice or judge retired for disability in accordance with this section is entitled thereafter to receive such compensation as the legislature may provide.

8. If a proceeding is brought against a justice of the supreme court, no justice may sit on the commission for that proceeding. If a proceeding is brought against a district judge, no judge from the same judicial district may sit on the commission for that proceeding. If an appeal is taken from an action of the commission to the supreme court, any justice who sat on the commission for that proceeding is disqualified from participating in the consideration or decision of the appeal. When any member of the commission is disqualified by this subsection, the supreme court shall appoint a substitute from among the eligible judges.

9. The commission may:

(a) Designate for each hearing an attorney or attorneys at law to act as counsel to conduct the proceeding;

(b) Summon witnesses to appear and testify under oath and compel the production of books, papers, documents and records;

(c) Grant immunity from prosecution or punishment when the commission deems it necessary and proper in order to compel the giving of testimony under oath and the production of books, papers, documents and records; and

(d) Exercise such further powers as the legislature may from time to time confer upon it.

(Emphasis added.)

[13]We do not, of course, suggest that violations of the criminal law necessarily fall within the Constitution's proscription of "willful misconduct." Nev. Const. art. 6, § 21(6)(a). *See,* ARJD 11(2), which provides: "[a]ny acts or omissions amounting to public offense which tend to corrupt or to impair the administration of justice in any court" are grounds for discipline by censure or removal.

has made no determination that excesses of jurisdiction have occurred as alleged by petitioner Whitehead. By deciding to consider the petition, the judgment we made was simply that (based on the petition and supporting documents) "the petitioner has set forth issues of *arguable* merit." (Emphasis added.)[14]

2. In the same vein, the referenced section 21 of our Constitution's "Judicial Department" article leaves no room for the Attorney General and associates to argue that jurisdiction to define procedures to be followed in receiving, investigating or processing disciplinary complaints rests with the Commission rather than with this court. The Constitution in article 6, section 21(5), explicitly states that the Supreme Court shall make appropriate rules for "(c) *The conduct of investigations and hearings.*" (Emphasis added.) Thus, jurisdiction to define how the Commission shall receive and process complaints lies entirely with this court, and not with the Commission.

Pursuant to the constitutional mandate just quoted, this court has heretofore adopted three different sets of rules to govern the Commission. In the initial set we clearly identified the rules by their title as "interim rules" since at that time we had absolutely no experience with the problems of implementing a structure for judicial discipline. In short order, we concluded that our first effort was inadequate, and so we substituted a second provisional set of procedural rules for Commission action that we designated

---

[14]Because our files in the proceedings are now open pursuant to Judge Whitehead's waiver of confidentiality, the public can now ascertain that this court's confidential order of July 22, 1993, merely recited:

### CONFIDENTIAL ORDER

Petitioner the Honorable Jerry Carr Whitehead having filed a petition for a writ of prohibition or in the alternative for a writ of mandamus directed to the respondent Nevada Commission on Judicial Discipline; and *it appearing that petitioner has set forth issues of arguable merit and that petitioner has no plain, speedy and adequate remedy in the ordinary course of law;* and good cause appearing therefor;

*IT IS HEREBY ORDERED that pending the determination of this petition on its merits, all proceedings* before and actions of the Nevada Commission on Judicial Discipline and the actions of those acting on behalf of the Commission relating to this matter, including the filing of an answer to a purported "complaint," the holding of a hearing to determine probable cause, and the conducting of any further investigative activities, *are stayed. . . .*

(Emphasis added.) Other provisions in the order, like its provisions for a stay, were merely intended to facilitate determinations as to whether the petition was meritorious and a proper subject for the exercise of our jurisdiction.

as "revised interim rules." With experience, we later became convinced that these rules also were flawed, and, following an extended period of study and solicitation of expert advice, the court adopted and published the permanent "administrative and procedural rules" (ARJD) that came into effect as of April 29, 1988.

The ARJD which govern activities of the Commission at the present date, were promulgated with the full knowledge and acquiescence of both then-Attorney General McKay and the Commission. Until the activities of the present attorney general were questioned by Judge Whitehead's counsel in these proceedings, neither Attorney General Del Papa nor the Discipline Commission ever objected to the adoption of any rule on which the petitioner Whitehead here relies.

It should be mentioned parenthetically that our study of the turmoil that has characterized the Commission's activities extended over a period of several years. To aid this court, we created a Study Committee that included JUSTICE CHARLES SPRINGER as well as lawyers and lay persons with substantial and relevant credentials. Study Committee members included a present United States Senator, a professor of political science, the immediate past chair of the Discipline Commission and a former United States Attorney for Nevada who has served as a legislator on the judiciary committee. Two Study Committee members had, in fact, served together on the Assembly Judiciary Committee when the language of article 6, section 21, was being prepared for submission to the voters of Nevada; and thus they, in effect, were co-authors of its language. This Study Committee conducted extensive factual and legal research, consulted experts at the National Judicial College and elsewhere, and finally submitted an extensive and thoughtful report that expressed conclusions concerning a perceived history of problems and dysfunctions.[15] Thus, again, we suggest that the Attorney General and associates have no grounds for advising the Commission to question this court's authority to enact and enforce any of the procedural rules that we have promulgated to govern the investigations and hearings of

---

[15]Without delving deeply into specific changes introduced in 1988 by the current procedural rules, there is no doubt that the Study Committee and this court intended to effect substantial changes in procedures that the prior "revised interim rules" could be read to allow. With the First Report of the Study Committee on Nevada Commission on Judicial Discipline contained in ADKT 38 in the office of our Clerk, there was submitted a draft set of rules which were the precursors of the ARJD now in effect. In its First Report, the Study Committee documented many problems that it believed loose practices had occasioned in the past, stating that the Study Committee was proposing corrective measures through a "structured process . . . to foreclose future

that body. (The issues of when and through what procedural expedients we may take corrective action if the rules are not obeyed are matters that we will consider shortly.) This court then submitted the Study Committee's report and its draft set of rules to a wide range of persons for comment, including members of the State Bar of Nevada, representatives of the news media, members of the Commission and the then-Attorney General. Comments were received from all the foregoing, and in almost all instances, this court accommodated the suggestions by making changes in the rules. Neither the then-Attorney General, the membership of the Commission, nor anyone else, raised any objection to ARJD 40(7) and ARJD 5, which form the basis of our action in the case now before us.

---

opportunities for such abuses of power." In this regard the Study Committee stated, among other things:

> [T]he Study Committee sees in past Commission operations . . . a secret, inquisitional body meeting behind closed doors investigating unspecified acts of judicial wrongdoing by unspecified judicial officers.

ADKT 38 at 7.

> Proceedings [under the proposed new rules] would then be accusatory rather than inquisitorial, open rather than closed, and accompanied by due process formalities (*e.g.*, specific accusations, right to challenge biased Commission members) rather than loose, unstructured and informal.

*Id.* at 8.

> [J]udges have been faced [under the old "revised interim rules"] with the prospect of secret, inquisitorial proceedings. There was no requirement of any formal, sworn accusatory document telling an accused judge the exact nature of the complaint.

*Id.* at 9.

> We have intended [by the proposed new rules] to provide a fair and open forum governed by clear and explicit rules.

*Id.*

> Initial complaints, in writing and under oath, must [under the proposed new rules] state specifically the nature of the offense (*e.g.*, violation of a section of the Code of Judicial Conduct) and the specific acts which constitute the offense.

*Id.* at 10.

> Potential injustice is foreclosed [in the new rules] by clearly defining the basis of the complaint and by requiring the charges to be reduced to writing and attested by an identified complainant.

*Id.* at 11.

> They [the old "revised interim rules"] are vague, lack checks and balances, and incorporate no adequate sanctions to deter misconduct by individual [C]ommission members.

*Id.* at 12-13.

> [P]artially because of deficiencies in the [old] Interim Rules, at least some members of the Commission have misconceived the constitu-

3. We will, nonetheless, discuss the constitutional justifications for those rules, after digressing briefly to lay at rest a contention that the Attorney General and associates continue to proffer in briefs to this court and to promote in public discussions with the news media about this pending litigation. The Attorney General and associates apparently believe that none of the activities they have pursued in the Commission's name in their extended effort to establish grounds for charges against petitioner Whitehead, and to find witnesses to support them, can possibly be wrong, whatever the ARJD may provide. This is so, they contend, because the procedures that they have employed in the Commission's name were "approved" by this court in the case of

---

tional purposes of the Commission. They appear to have proceeded on the assumption that they were possessed of unbridled discretion to formulate and act upon their own notions of appropriate judicial conduct without reference to established norms.

*Id.* at 13.

To this end [providing due process and prompt open disposition of legitimate charges], they [the proposed new rules] are designed to foreclose the Commission from secret, inquisitorial processes which result in *ad hoc* decisions neither related to nor tethered by principle.

*Id.* at 13.

Planned, selective leaks [as described by the Study Committee] resulted in giving inaccurate and unreliable information to the public, which [in one case mentioned by the Study Committee] incited public furor and unjustifiably damaged the reputation of a judicial officer who was never even charged. After almost two years, the Commission was compelled to concede that its costly, secret inquisition had generated no evidence against such officer.

*Id.* at 7.

The proposed rules seek to protect judges from these kinds of unwholesome, un-American practices.

*Id.* at 8.

As this court learned in the course of its study of the subject, the disciplinary rules of some states can be read (if commissioners and prosecutors are disposed to do so) to authorize the kinds of abuses identified by our Study Committee. In a majority of states, however, disciplinary rules include more explicit due process protections. *See* The New York Commission on Judicial Conduct, 1988 Annual Report, 57-58 (1988), wherein New York practices were described as follows:

The commission for example, lacks the broad discretion given to law enforcement agencies to commence investigations on the basis of mere suspicion; a commission inquiry must be based on a written complaint and (pursuant to court decisions) the scope of the inquiry must be limited to subject matter that is related to that complaint.

In view of advice from the Study Committee and other respected authorities, we therefore decided in 1988 to adopt very explicit rules and practices, far less conducive to unwholesome and quite probably unconstitutional abuses than the "revised interim rules" had proved themselves to be.

Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992). With all due respect to the Attorney General and associates it appears that their researchers have not read our *Goldman* opinion with adequate care. If that had been done, it would be recognized that Commission proceedings against Judge Goldman were conducted under the prior "revised interim rules" which no longer even exist. The current rules were adopted after the Commission's ruling in *Goldman.* Indeed, in *Goldman,* this court explicitly noted that "the current rules were not in effect at the time of the proceedings against appellant and did not govern those proceedings." 108 Nev. at 258 n.4, 830 P.2d at 111 n.4.

There are, furthermore, several other significant factual distinctions between the *Goldman* case and this one. In *Goldman,* for example, upon employment of the "special prosecutor," Attorney General McKay withdrew totally from all personal participation in the proceedings and allowed the "special prosecutor" real independence. In sharp contrast to the role that Attorney General Del Papa has assigned herself to play in the present case, Attorney General McKay permitted the independent "special prosecutor" hired by the Commission in *Goldman* to perform his function as independent counsel to the Commission without interference or "guidance" from Attorney General McKay. This, of course, enabled Attorney General McKay to avoid generating the kinds of conflicts that would have been present if he had simply used a "special prosecutor" as an attaché and special deputy attorney general to help him pursue ends that he may have desired to see realized. There may be various other significant differences between the role played by "special counsel" in the *Goldman* case and the role assumed by Attorney General Del Papa's "special deputy attorney general/ special prosecutor" in this case; however, because such differences raise concerns that may relate to the merits of Judge Whitehead's petition, any in-depth consideration of them would not now be appropriate.[16] Suffice it to say for present purposes that the *Goldman* case (a) involved an appeal and not a writ proceeding challenging jurisdiction; (b) was decided under an entirely different set of less-definitive rules; and (c) raised and decided issues that were not remotely coincident with those here involved. It therefore is not a relevant judicial precedent on the issues before us.

---

[16]It may be noted, however, that in *Goldman* the "special prosecutor" predicated his presentation at the probable cause hearing primarily on evidentiary data compiled by original complainants, rather than grievances he had searched out himself. From the petitioner's perspective, this appears to be a significant distinction.

4. Aside from their invocation of *Goldman,* the ultimate position of the Attorney General and associates, as we previously have mentioned, appears to be that even if the actions they have pursued and counseled are not in compliance with the applicable rules duly promulgated by this court pursuant to the Nevada Constitution, we are powerless to correct any mere interlocutory deviation from the rules by issuing a writ, and especially not a "secret" one. We therefore turn to review the pertinent legal authorities which repel the misperception under which the Commission members evidently have been counseled to place themselves in jeopardy of sanctions for contempt.

5. In the matter before us, petitioner Whitehead's counsel are alternatively seeking either a writ of prohibition or a writ of mandamus. They ask for a writ of prohibition on grounds that acts done and being done in the Commission's name exceed the Commission's jurisdiction as set out in the substantive and procedural rules this court adopted in response to our constitutional mandate, Nev. Const. art. 6, § 21(5)(a-c), and that such acts, therefore, should be prohibited from continuing.[17] Petitioner's counsel alternatively seek a writ of mandamus on grounds that because the Commission has been induced to act in ways that do not comport with its lawfully-defined functions, mandamus should issue commanding compliance with all lawful duties that heretofore have been ignored in the proceeding against Judge Whitehead.[18] It is common practice in writ proceedings to tender alternative requests when seeking writs, just as petitioner's counsel have done here, because in many instances pertinent facts can arguably be marshalled in a manner that satisfies the requirements of two or more different writs. That is arguably true in the case at bar. Judging this matter simply from the perspective of the historical availability of prohibition or mandamus as recognized in the Nevada Constitution, Nevada statutes and case authority, either prohibition or mandamus seemingly should be available to

---

[17]The theory of petitioner's request is within the traditional scope of prohibition as historically recognized and codified in Nevada law. NRS 34.320 provides: "Writ of prohibition defined. The writ of prohibition is the counterpart of the writ of mandate. It arrests the proceedings of any tribunal, corporation, board or person exercising judicial functions, when such proceedings are without or in excess of the jurisdiction of such tribunal, corporation, board or person."

[18]The theory of this request is within the traditional scope of mandamus as historically recognized and as codified in Nevada law. NRS 34.160 provides: "The writ may be issued by the supreme court, or a judge of the district court, to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled and from which he is unlawfully precluded by such inferior tribunal, corporation, board or person."

correct the abuses petitioner's counsel claim have been done in the Commission's name, provided that the remaining traditional condition for each writ is satisfied.[19]

6. The remaining, traditional condition precedent to the issuance of a writ concerning which the court would need to satisfy itself before issuing a writ of prohibition or mandamus (at least, if this case involved any governmental agency other than the Judicial Discipline Commission) would be whether the alleged deviations from lawful duty, if they occurred, were of such a kind and magnitude that the petitioner had no adequate remedy by appeal or otherwise to correct them.[20] In this case, we naturally will express no opinion on how this question should be decided until the merits of petitioner Whitehead's request for a writ are eventually considered. As noted, in issuing our prior orders indicating that we would *consider* issuing a corrective writ, we merely found that the petitioner presented—

> (1) an *arguable* basis for contending that there had been deviations from the rules governing the Commission; and,
> (2) such deviations may *arguably* have been of a character and magnitude that petitioner has no adequate remedy to correct them, except through writ proceedings.

As to the basis for the foregoing provisional determinations, our reasons were quite straightforward. *If* petitioner's contentions about actions taken in the Commission's name prove true (and Commission members may not know the full truth about such contentions, any more than this court yet does),[21] practices

---

[19]*See* article 6, section 4, of the Nevada Constitution which gives the Supreme Court "power to issue writs of *mandamus, certiorari*, prohibition, *quo warranto*, and *habeas corpus* and also all writs necessary or proper to the complete exercise of its appellate jurisdiction." This provision is discussed at length in footnote 1, at the beginning of this opinion.

[20]NRS 34.170 provides in pertinent part: "This writ shall issue in all cases where there is not a plain, speedy and adequate remedy in the ordinary course of law." *See, e.g.*, Schlatter v. District Court, 93 Nev. 189, 561 P.2d 1342 (1977) (extraordinary relief was available to review an interlocutory order which could cause irreparable harm to the affected party).

[21]In fact, assuming Commission members have scrupulously avoided compromising their capacity as fair and impartial adjudicators, as contemplated by the current rules, they will have avoided all involvement in the investigative efforts and all *ex parte* communications concerning them with Attorney General Del Papa and associates. The activities that petitioner's counsel seek to establish herein, therefore, do not necessarily involve wrongdoing on the part of Commission members, except to the extent that they might knowingly have involved themselves in some of the alleged rule violations assertedly perpetrated in the Commission's name. Accordingly, much, if not all, of the behavior being challenged herein is in fact related to the activities of Attorney General Del Papa and associates performed in the

employed and counseled by the Attorney General and associates may involve multiple violations of this court's constitutionally-mandated rules. *If* such violations occurred, they may likewise be of such a magnitude and character that neither an "appeal" in the narrow sense, after awaiting a "final" dispositive Commission order (which may never issue), nor any other legal remedy except a writ of prohibition or mandamus, will be adequate to prevent the injury and harm that petitioner claims to be suffering. Without belaboring this point further, when we issued our prior orders, we were satisfied that petitioner had tendered a sufficient showing of ongoing and irreparable harm to justify our provisional determination that we should consider the matter further, to ascertain whether the facts justify issuance of an interlocutory writ of mandamus or prohibition.

7. In any other case, the foregoing would end the discussion; however, the Attorney General and associates appear to contend that because the Commission members are serving as an independent entity of our state government, and are not in fact part of the "Judicial Department" of government (even though the constitutional provision creating the Commission places it there), actions performed in the Commission's name are wholly exempt from review by extraordinary judicial writ. A parallel contention was considered and rejected in State v. Board of Regents, 70 Nev. 144, 261 P.2d 515 (1953). *Board of Regents* involved an attempted invocation of this court's authority to examine, by way of extraordinary writ, a tenured professor's disciplinary proceedings before the University of Nevada's Board of Regents, an independent body outside the Judicial Department of our government. As in the case now before us, the Attorney General of Nevada then contended that the professor's challenge to the disciplinary charges against him could not be heard in this court for the exact reasons the Attorney General and associates now tender. As Attorney General Del Papa and associates do now, the Attorney General in *Board of Regents* based this contention on the proposition that the Board of Regents, being outside the Judicial Department of Nevada government, was not subject to this court's review. This court rejected the contention:

> It is first asserted by respondents that, since the board of regents is a duly constituted administrative board established under the constitution and statutes as a part of the executive department, it is beyond any control by the courts, and that

---

Commission's name. As such, those allegedly improper activities, or at least many of them, could perhaps have been questioned by proceedings in the nature of *quo warranto* directly against the Attorney General and associates—a question we do not reach.

> this is so irrespective of whether the action of the board was executive, administrative or judicial. In support of this contention respondents rely upon King v. Board of Regents, 65 Nev. 533, 200 P.2d 221. That case does not so hold. Our opinion dealing with the exclusive control of the university by the board of regents expressly and repeatedly referred "to their constitutional, executive and administrative capacity," and to their "executive and administrative control." That the constitutional separation of powers prevents any judicial review of the judicial or quasi judicial acts of the board of regents when an excess of jurisdiction is in question was not the holding in the King case or in any other authorities cited by respondents. The contrary is the rule in this state and in virtually all other jurisdictions.

*Id.* at 147-48, 261 P.2d at 516-17 (citations omitted).

The *Board of Regents* case is closely on point, and totally dispositive as to the contention under consideration. Many other Nevada authorities to the same effect can be cited.[22]

---

[22]The power of this court to issue extraordinary writs to compel or restrain the actions of persons holding offices created by the Nevada Constitution has existed untrammelled from the early days of this State to the present day. *Compare* State of Nevada v. Blasdel, 4 Nev. 241 (1868) (writ of mandamus ordering Governor to issue a land patent); *with* Stumpf v. Lau, 108 Nev. 826, 839 P.2d 120 (1992) (writ of mandamus issued ordering Secretary of State to remove initiative from ballot). We will briefly review some of the more illustrative examples from among the dozens upon dozens of examples scattered throughout the history of this State.

1. Writ issued to compel action by the Secretary of State: *Stumpf v. Lau, supra;* Choose Life Campaign '90' v. Del Papa, 106 Nev. 802, 801 P.2d 1384 (1990) (writ of mandamus issued ordering Secretary of State not to disseminate misleading arguments regarding abortion referendum); State Gen. Obligation Bond v. Koontz, 84 Nev. 130, 437 P.2d 72 (1968) (writ of mandamus issued compelling Secretary of Colorado River Commission and Secretary of State to send out notice of sale of state bonds); Lundberg v. Koontz, 82 Nev. 360, 418 P.2d 808 (1966) (writ of mandamus issued compelling Secretary of State to refrain from publishing ballot initiative); Wilson v. Koontz, 76 Nev. 33, 348 P.2d 231 (1960) (writ of mandamus issued compelling Secretary of State to file ballot initiative); Watson v. Koontz, 74 Nev. 254, 328 P.2d 173 (1958) (writ of mandamus issued compelling Secretary of State to accept a declaration of candidacy); State v. Koontz, 69 Nev. 25, 240 P.2d 525 (1952) (writ of mandamus issued compelling Secretary of State to file articles of incorporation without charge).

2. Extraordinary writ issued compelling Attorney General to refrain from acting: Ryan v. District Court, 88 Nev. 638, 503 P.2d 842 (1972) (writ of prohibition issued preventing Attorney General from filing an improper charging document).

3. Writ of certiorari issued to review proceeding before the Board of Regents of the University of Nevada: Richardson v. Board of Regents, 70 Nev. 347, 269 P.2d 265 (1954) (writ of certiorari issued to review disciplinary proceedings before the Board of Regents to fire a professor).

4. Writ of mandamus issued to compel action by State Board of Exam-

Before moving to another subject, however, we further emphasize the principles discussed in the instant issue by referring to a case which not only implicated the precise contention proffered by the Attorney General and associates, but also concerned facts strikingly similar to those of the present case. In People ex rel. Harrod v. Illinois Cts. Com., 372 N.E.2d 53 (Ill. 1977), the Illinois Supreme Court concluded that it clearly possessed the power to exercise mandamus jurisdiction over the Illinois Courts Commission, notwithstanding the fact that the Illinois Constitution did not even authorize that state's high court to review the Courts Commission's judicial disciplinary decisions on appeal.

In *Harrod*, the Courts Commission contended that the Illinois Supreme Court lacked jurisdiction to entertain a judge's mandamus petition challenging the jurisdiction of the Courts Commission. The Courts Commission argued that the court could not issue a writ of mandamus because the Courts Commission was a constitutionally created body with exclusive power to interpret and define its authority. The Illinois Supreme Court predictably rejected the Commission's contention, however, and concluded instead that, although the Commission—like the court—derived its authority from the state constitution, the Commission was not a coequal "fourth" branch of government, nor was it a court within the meaning of the state constitution's judicial article. Rather, it was the function and duty of the Illinois Supreme Court, not the Commission, to act as the final arbiter of the Illinois Constitution. As such, the court held, the Illinois Supreme Court possessed both the authority *and the responsibility* to determine whether the actions of the Courts Commission in judicial discipline proceedings were beyond the Commission's constitutional grant of authority and, if so, to declare such actions invalid.

---

iners and State Controller: S.N.E.A. v. Daines, 108 Nev. 15, 824 P.2d 276 (1992) (writ of mandamus issued ordering Controller to issue warrants for salaries of state employees including pay raises to which Governor and Board of Examiners objected); Armstrong v. State Bd. Examiners, 78 Nev. 495, 376 P.2d 492 (1962) (Controller and Board compelled to pay petitioner's salary); State v. Eggers, 29 Nev. 469, 91 P. 119 (1907) (Controller ordered to pay petitioner's salary); State of Nevada v. Parkinson, 5 Nev. 15 (1869) (Controller ordered to pay petitioner's salary).

5. Extraordinary writ compelling Governor to take action: State Bar of Nevada v. List, 97 Nev. 367, 632 P.2d 341 (1981) (writ of mandamus issued requiring Governor to declare judgeships vacant); State v. Dickerson, 33 Nev. 540, 113 P. 105 (1910) (writ of mandamus granted requiring acting Governor to accept certain bonds on behalf of the state).

6. Miscellaneous state boards or agencies: Raggio v. Campbell, 80 Nev. 418, 395 P.2d 625 (1964) (writ of prohibition issued prohibiting State Board of Parole Commissioners and the Warden of the State Prison from releasing certain prisoners); State v. Nevada Ind. Commission, 40 Nev. 220, 161 P.2d 561 (1916) (mandamus proper to order Commission to pay judgment).

Thus, in *Harrod,* the court "totally rejected" the suggestion that the Courts Commission could interpret and determine the scope of its own authority, as well as the corresponding implication that the court was without power in a writ proceeding to determine whether the state constitution's grants or limitations of authority had been exceeded by the Courts Commission.

Other states have also had little trouble entertaining extraordinary writs challenging the jurisdiction of their state judicial discipline commissions. State Ex Rel. Turner v. Earle, 295 So.2d 609 (Fla. 1974) (supreme court had jurisdiction over Judicial Qualifications Commission under rule-making power and "all-writs" provisions of state constitution); State Ex Rel. Shea v. Judicial Standards Comm., 643 P.2d 210 (Mont. 1982) (writ of prohibition issued because Judicial Standards Commission exceeded its jurisdiction); Christensen v. Bd. of Comm'rs, 575 N.E.2d 790 (Ohio 1991) (Ohio Supreme Court held a writ of prohibition proper where Commission "about to exercise quasi-judicial power"); Herald Ass'n v. Judicial Conduct Bd., 544 A.2d 596 (Vt. 1988) (Vermont Supreme Court entertained extraordinary writ seeking disclosure of judicial conduct board materials); Richter v. State Comm'n on Judicial Conduct, 430 N.Y.S.2d 796 (N.Y.Sup.Ct. 1980) (granting writ of prohibition because Commission acted in excess of jurisdiction); *see also* Matter of Marquardt, 778 P.2d 241 (Ariz. 1989) (Supreme Court is the final arbiter on judicial discipline questions); In Re Greenwood, 796 P.2d 682 (Utah 1990) (Supreme Court is constitutionally obligated to review judicial conduct proceedings).

8. As noted above, the current rules which guide and limit practices to which the Commission must conform when it receives complaints, conducts investigations and holds hearings were promulgated by this court pursuant to constitutional mandate—and without adverse comment from the Attorney General's office or the Commission as to the rules specifically concerned in this case. ARJD 40(7), as much, or more, for the benefit of prosecutors as for respondent judges subject to possible disciplinary action, provides:

> Review of interlocutory orders of the commission, which are considered either by the prosecuting officer or the respondent judge to be without or in excess of jurisdiction, may be sought by way of petition for an appropriate extraordinary writ.

These rules were partially based on recognition of problems that a prosecutor for the Commission had faced in obtaining a speedy, authoritative answer to a jurisdictional issue that related to a Reno municipal judge. ARJD 40(7) was, of course, also adopted in the

recognition that prior Commission practices, in which investigations concerning illusory or unfounded charges about innocent judges had languished while the subject judges and their families were subjected to the torments occasioned by untruthful "leaks" to the press, could no longer be tolerated. It is most difficult to raise a legitimate question or challenge to the sound policy which supports the enactment of ARJD 40(7) and the constitutional and precedential authority which supports the rule.

ARJD 5(1) of the current procedural rules provides:

> All proceedings must be confidential until there has been a determination of probable cause and a filing of formal statement of charges.

Under the constitution, case law and especially under ARJD 5(1), the Vice-Chief Justice's decision to order files in these proceedings to be kept confidential, in order that the confidentiality of the proceedings before the Commission would be maintained, cannot plausibly be questioned. In various orders hereinbefore entered, all members of the court, as now constituted, have implicitly recognized the foregoing, as the State Bar of Nevada's Board of Governors did explicitly at the Board's official meeting on December 17, 1993.

If we correctly understand the Attorney General and associates, they may be harboring some idea that Nevada's constitutional mandate of confidentiality of judicial discipline proceedings is, nonetheless, itself unconstitutional under the Federal Constitution. In the previously quoted letter of October 14, 1993, the Commission was induced to protest vaguely about "secret, illegal and void 'orders.'" If the notions of the Attorney General and associates are predicated on hopes that the United States Supreme Court would support their views by so interpreting the Federal Constitution, their prospects seem most doubtful in light of the comment concerning such confidentiality provisions articulated by the United States Supreme Court in Landmark Communications, Inc. v. Virginia, 435 U.S. 829 (1978).

9. In section 3 of this opinion we have already treated the untenable contention that in *Goldman v. Nevada Comm'n on Judicial Discipline, supra,* this court "approved the procedural practices" employed by the Attorney General and her colleagues in the Commission's name. We now turn to address their contention that in *Goldman* we made a pronouncement that establishes the point that this court has no authority to intervene in Commission proceedings by issuing an interlocutory writ to review alleged Commission abuses. In their Opposition to Motion to Strike, filed herein on October 27, 1993, the Attorney General and associates assert that in *Goldman,* this court recognized "the independent authority of the Commission" as follows:

A Commission decision to censure, remove, or retire is not merely advisory or recommendatory in nature; it is of independent force and effect absent perfection of an appeal to this court. **This broad constitutional authority distinguishes Nevada's commission from similar commissions in other jurisdictions. . . .** It is readily apparent that by deviating from the California model, the drafters of article 6, section 21 of the Nevada Constitution rejected California's "recommendation" system in favor of procedures intended **to vest a far greater degree of authority in Nevada's commission. . . .** We conclude, therefore, that the Nevada Constitution does not contemplate this court's *de novo* or independent review of factual determinations of the commission on appeal. To the contrary, **the constitution confines the scope of appellate review of the commission's factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission's findings.**

**The commission possesses the authority to weigh and balance all the equities as well as the rights of the judge and the public's interest in the competence and ethical integrity of the bench.... The proceedings before the commission must be allowed to run their full constitutional course from their inception to their conclusion.**

At first glance this "excerpt" certainly has power to persuade a casual reader, such as a newspaper reporter, that this court is acting in a manner directly contrary to the views expressed in *Goldman.* In fact, it takes a trained lawyer some time to unravel just how the above quotation was constructed by the Attorney General and associates and how far it deviates from the approved editorial practices that we expect lawyers to employ when they prepare documents for submission to this court. In reality, the above "quote" consists of seven sentences lifted out of different paragraphs and spanning nine pages of text and two entirely distinct sections of the *Goldman* opinion. The quoted passage is deceiving as to which sentences are at the beginnings of paragraphs, which are at the middle and which are at the end. Some of the sentences are emphasized, with no indication that the emphasis has been supplied, as proper editorial procedures require. It is difficult for even a sophisticated researcher to discover all this, because the Attorney General and associates cited only to a year-old "slip" opinion, even though reference to the available printed report would have been the approved practice to facilitate confirmation of the point being tendered. In several instances the Attorney General and associates even failed

to use ellipses to indicate that material had been omitted between sentences. The last sentence of the passage is taken out of context and is placed adjacent to a sentence that supplies a misleading meaning to it. The truth is that the last sentence in the above "quote" simply means and says that the Governor may not interrupt disciplinary proceedings before the Commission by assembling a panel of physicians to allow a judge charged with misconduct to retire with an enhanced disability pension.

10. Up to this point there appears to be no basis (except as an emotional reaction or a political stance) for disagreement with any of the foregoing. As has been demonstrated above, conscientious review of the pertinent legal authorities repels a contention either that actions the Attorney General and associates have advised the Commission to take, or activities pursued by the Attorney General and associates in the Commission's name, are immune from our review. The pertinent authorities also clearly establish that this court is obligated to maintain the confidentiality of any petition for our review (prior to a determination of probable cause) in order to maintain the confidentiality of proceedings to which Commission proceedings are constitutionally entitled.

Understandably concerned about untruthfulness concerning these proceedings that was being generated by a Nevada newspaper on the basis of illegal "leaks," the Board of Governors of the State Bar of Nevada undertook to evaluate the bases for this court's actions. After its investigation, in a public statement issued by the Board on December 17, 1993, the State Bar of Nevada publicly expressed its conclusion as follows:

> Administrative and Procedural Rule 40(7) allows a judge to challenge the jurisdiction of the Commission. Judge Whitehead has filed a petition challenging the jurisdiction of the Commission.
> Until there has been a determination that probable cause exists, proceedings alleging misconduct are to be conducted confidentially. The court has issued an order lifting the confidentiality of the Whitehead proceedings based on a waiver of confidentiality by Judge Whitehead.

This is all rather obvious, but we have, nonetheless, often "belabored the obvious" in this opinion in order to disabuse Commission members of incorrect legal impressions they may have received from the newspapers or other poorly informed sources. We expect that much that is included herein about the substantial legal underpinnings for our judicial actions will be new information to at least some of the Commission members.

We certainly hope so; we have no desire to experience further delay in these proceedings as a result of contumacious conduct.

While the substantial precedential underpinnings of our prior orders may not have heretofore been well-explained to Commission members, this opinion's assertion of our jurisdiction to entertain these proceedings should surprise no one. A number of prior orders have been entered herein by various members of the court then available. Our rationale for concluding that this court has jurisdiction to proceed herein may not have been as well-explicated in those orders as it is in this opinion; nevertheless, by joining in one or more of them, we think that each member of the present panel (except SENIOR JUSTICE ZENOFF) has implicitly recognized that this court has proper jurisdiction over these proceedings, and that, until the "confidentiality" was ended by petitioner Whitehead's waiving of confidentiality, this court had a constitutionally-based obligation to shepherd the proceedings in a confidential setting.

Before declaring himself disqualified in this case, our Chief Justice joined in several of such orders. In his disqualification statement, our Chief Justice also stated, among other things: *"While the Nevada Supreme Court has authority to review preliminary orders of the Commission as well as its final result,* any preliminary review should be done swiftly and with deference to the Commission." (Emphasis added.) It, therefore, cannot be questioned that our Chief Justice also disagreed with the argument of the Attorney General and associates as to their contentions that this court lacks jurisdiction to undertake review of Commission actions.

We likewise consider the Chief Justice to have been correct in saying that our "review should be done swiftly [consistent with due process] and with deference to the Commission." That is why, when the Commission was resistant to the court's initial directive to deliver certain records directly to Judge Whitehead's counsel, we modified our order to provide that the records be delivered to this court for its private *("in camera")* inspection only. The merits of these proceedings might have been determined by now if the Commission had not been incorrectly advised that our orders were void because they were "secret" and because the Commission is beyond any judicial review.

On the subject of the deference which we believe is the Commission's due, more will be said in the conclusion of this opinion, which follows. In that conclusion we explain that, in legal effect, the Commission is a constitutionally-created "Court of Judicial Performance and Qualifications," whose activities are entitled to extreme deference when duly confined to their proper constitutionally-contemplated sphere.

### CONCLUSION

To avoid any possible future misunderstandings, it seems appropriate to explain more specifically the role of the Commission in the government of this State. We have already noted some of the things that the Commission is *not,* for example:

(a) The Commission is not part of any department of government other than the "Judicial Department."
(b) The Commission is not a separate, fourth "department of government."

Whatever the Commission may heretofore have been led to believe, the Commission is in fact a part of the "Judicial Department" of Nevada government exactly as the constitutional provisions creating it in 1976 denoted. Additionally, as mentioned before in the body of this opinion, even if the Commission were part of a separate department of our government (or by itself constituted one), the members of the Commission would still be accountable to this court in the exercise of the court's usual powers, which include, among other things, the issuance of the writs of mandamus, certiorari, prohibition, quo warranto and habeas corpus directed to non-judicial officers. Commission members do not enjoy an exemption from the responsibility to answer to the writs that regularly are employed to question the activities of constitutionally-established Nevada officials such as our Governor, Lieutenant Governor, Secretary of State, Treasurer, Controller, Attorney General, District Judges, Board of Examiners and Regents of the University of Nevada System.

We want to make it very clear, however, that we in no way regard the Commission merely as an administrative agency or arm of this court. If we embraced such a perception of the Commission, then in the new procedural rules (ARJD) that we promulgated for the Commission's regulation in 1988, we would have declared that Commission members could claim only qualified "administrative" immunity from law suits. Such an immunity would have been the most we could recognize under holdings of our nation's High Court if we expected the Commission to pursue functions that are administrative or otherwise non-judicial in nature.[23] Instead, we declared that the Commission members,

---

[23]We do not wish to extend this opinion unduly with a lengthy discussion of current distinction among the terms "administrative," "judicial" and "prosecutorial" as they relate to immunity as the law has evolved in decisions relating to civil rights actions brought pursuant to 42 U.S.C. § 1983 *et seq.* It is enough here to say that if this court had framed Commission rules

while acting within the scope of their authority, shall enjoy absolute immunity from suit, which is to say: judicial immunity. *See* ARJD 13. The premise for our action was that, under the rules, the Commission members would be confined to fulfilling the essentially judicial function of determining facts from evidence brought before them in an adversarial setting and applying the facts to substantive rules theretofore established by duly constituted authority.[24]

Because of the foregoing, in a certain sense, it is as vital to the Commission as to a respondent judge that the limitations marked out by our current rules (which seek to prevent the Commission's judicial function from being tainted by involvement in investigative and prosecutorial activities) shall be effectively enforced. Such enforcement could not be achieved solely by deferring review of Commission proceedings until appeal from a "final,"

---

to allow the Commission members wide-ranging administrative or police functions, they at most would have limited immunity as to those activities. *See, e.g.,* Forrester v. White, 484 U.S. 219 (1988) (judge acting in administrative capacity relating to discharge of court employee held not entitled to judicial immunity, but only to limited or qualified immunity). Also, if we allowed Commission members to drift totally outside the judicial realm assigned to them by the ARJD, Commission members might be held to have no immunity at all. *See* Harris v. Harvey, 605 F.2d 330 (7th Cir. 1979) (judge who participated in non-judicial activities against a police officer subject to disciplinary proceeding, including acts injuring officer through adverse newspaper publicity, enjoyed neither judicial nor prosecutorial immunity for such acts done in absence of jurisdiction).

[24]We regard the Commission as being a constitutionally established "court of judicial performance and qualifications," whose functions, as defined in the "Judicial Department" article of Nevada's Constitution, are essentially of the same fact-finding and law-applying nature that the state Constitution assigns to the District Courts of this State. The Commission's constitutionally-assigned functions do not include defining what constitutes ethical-wrongdoing any more than the District Courts may make authoritative pronouncements as to what conduct constitutes crimes or civil torts. Like the District Courts, the Commission is not free to define its own procedures; however, it certainly would receive an attentive hearing if it ever requested this court to amend some rule we have promulgated, as the District Courts occasionally do. Absent such an amendment, the Commission is obligated to accept and apply both the substantive rules of conduct and the rules of procedure as they are stated by this court, however much Commission members or a prosecutor presenting evidence to them might disagree with the rules in any given case. This is not to say, of course, that the Commission is subservient to this court, any more than are the District Courts; rather, we are saying that the Commission must faithfully perform its constitutionally-assigned functions in the judicial disciplinary process. When it appears that the Commission is being caused to stray outside its jurisdiction, as defined in the substantive or procedural rules we have adopted pursuant to constitutional mandate, the Commission members are no less subject to having their actions subjected to interlocutory judicial review than are judges of the District Courts.

dispositive Commission order. The most grievous jurisdictional impositions could then escape review simply because a "special prosecutor" hired to present a case did not see fit to press the case to completion after causing great damage in the Commission's name. Also, even if some aggrieved respondent judge ultimately obtained the opportunity to appeal from a "final" disposition, it might be impossible for this court to correct the harm earlier done either by improper acts of an administrative or prosecutorial nature in which the Commission has allowed itself to become implicated, or by acts of a judicial nature violating fundamental requisites of judicial due process.

Under these circumstances, the Commission members might find themselves held personally accountable for the judge's damages in federal as well as state tribunals; therefore, we deem it equally as important for them as for the respondent judge that we allow interlocutory review of their stewardship of the Commission when a petition for extraordinary writ arguably reflects serious deviations from rules defining Commission jurisdiction. In short, a holding that action performed in the Commission's name is totally immune from interlocutory review would not be calculated to serve the interests of Commission members or anyone else, except possibly to protect prosecutors from scrutiny, at the expense of Nevada's citizens, its judges and its legal system.[25]

---

[25]As we have noted before, the case of Goldman v. Nevada Comm'n on Judicial Discipline, 108 Nev. 251, 830 P.2d 107 (1992), is no precedent to the contrary on this issue. Our decision in *Goldman* does, however, reflect our high respect for the Commission and our perception that its factual determinations are entitled to deference similar to that which we extend to those of the District Courts. In *Goldman,* we stated:

> We conclude, therefore, that the Nevada Constitution does not contemplate this court's *de novo* or independent review of factual determinations of the commission on appeal. To the contrary, the constitution confines the scope of appellate review of the commission's factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission's findings. The commission's factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.

108 Nev. at 267, 830 P.2d at 117-18.

Thus, we assigned a higher status to the Commission and accorded greater deference to its final decisions than other courts have done, in accord with our view that the Commission is not to be regarded merely as an administrative agency but as a true "Court on Judicial Performance and Qualifications." Our deference to the Commission is in significant contrast to the California Supreme Court action in the case of Geiler v. Comm'n on Judicial Qualifications, 515 P.2d 1 (Cal. 1973). Still, the fact that we held in *Goldman* that the Commission, like the District Courts, is free from our *de novo* or independent review of factual findings only emphasizes how impor-

As indicated above, some considerable time before this court ultimately changed them, we had concluded that the old "revised interim rules" were dangerously deficient because they did not adequately assure that Commission procedures should be kept essentially judicial in character. We therefore sought to define better procedures which did not blur the Commission's proper fact-finding and law-applying function with investigative and prosecutorial functions that inevitably encourage commitment to a pre-judged result. On the bases of our study and experience, we enacted the current rules which are distinctly more specific in defining the Commission's proper role, and which explicitly allow for an interlocutory review by either the respondent judge or by the special prosecutor. *See* ARJD 40(7).

Despite this history, it seems that the Attorney General and associates may have counseled the Commission to proceed as the abrogated "revised interim rules" could be read to allow, which is to say, in direct violation of the current procedural rules or ARJD. We do not now decide whether in fact this has occurred. Nor do we decide whether, if deviations occurred as the petitioner alleges, we should deem them so prejudicial that a writ terminating proceedings before the Commission should issue. What is important now is that, on the showing tendered by petitioner, the court felt constrained to determine if the facts warranted the issuance of a writ as the petitioner is requesting. In order to make a meaningful inquiry by this court possible, we have ordered *"in camera"* delivery of Commission records so that we may see what documents might be essential to resolve petitioner's claims fully and fairly to both sides.[26]

---

tant it is in Nevada's system that the Commission, like our District Courts, shall apply with fidelity the substantive legal principles articulated by other constituted authority. It also underscores that in Nevada it is highly important that the established substantive rules or principles be applied only in compliance with the procedural requirements delineated by constituted authority. Moreover, in Nevada, as with our District Courts, when counsel may have led the Commission to stray from its jurisdiction as defined in the rules by other constituted authority, it is important that such deviations be subject to review by interlocutory writ, as are those of the District Courts.

[26] Of obvious implication in this proceeding is the meaning and scope of ARJD 14(5) which states:

In preparing to oppose a determination of probable cause, the respondent has the right to inspect all records of the commission relating to the disciplinary action against the respondent and to be fully advised as to the contents of the administrative record considered by the commission determining that there was sufficient reason for a probable cause hearing.

We note once again that this court has not previously had occasion to interpret the meaning and scope of this rule, including "the right to inspect

In the course of deciding whether or not petitioner's counsel need to see any part of the Commission's records, this court fully intends to be sensitive to the Commission's concerns that persons interviewed by the Attorney General and associates should be protected. Especially is this true of persons who may have supplied information confidentially, not expecting to be witnesses, pursuant to promises that their identities would not be revealed. In accord with practices common when courts conduct *"in camera"* inspection of documents during disputes over discovery issues, the identity of confidential informants can be protected by "redacting" any relevant material that would identify the confidential informant. *See* Donrey of Nevada v. Bradshaw, 106 Nev. 630, 798 P.2d 144 (1990).

If "redacting" will not suffice for the purpose, other expedients will be employed by the court to assure that no persons who have been promised confidentiality will be jeopardized. We intend to give substantial respect to the concerns of the Attorney General and associates; however, we cannot allow the prosecutors to be the arbiters of whether the investigative initiatives they have pursued in the Commission's name violate the current rules. To move this matter forward by resolving this issue, it remains necessary for this court to review all records called for by our prior orders.

This brings us back to the question of what should now be done to address the resistance to our lawful orders which it appears prosecutors have advised and promoted. Willful violations of this court's orders are, of course, sanctionable in various ways. However, we do not intend to consider these options unless it comes to appear that the Commission's members, having now been fully advised of the basis of our prior rulings, hereinafter willfully elect to follow a contumacious course.

Before proceeding further, we therefore suggest that each individual member of the Commission may be well-advised to review the contents of this opinion carefully and to discuss its contents in depth with some independent, qualified attorney in whom he or she reposes special confidence. To facilitate this, we direct the Clerk of this court, forthwith, to initiate steps to provide all Commission members and alternates with two certified copies of this opinion, either personally or by certified mail with return receipt requested.

As to the conduct of the Attorney General and associates, as discussed above, and as variously reported in the news media, we

---

*all* records of the commission *relating to the disciplinary action"* and respondent's right to be *"fully advised"* as to the contents of the administrative record. (Emphasis added.)

also take no immediate action pending further deliberations of the court.

Accordingly, we deny the motion of October 12, 1993, seeking reconsideration and a stay of our order of October 4, 1993. Additionally, we deny the request for oral argument on the motion for reconsideration.

The members of the Nevada Commission on Judicial Discipline, namely, General Drennan A. Clark, Alan Lefebvre, B. J. Fuller, Frank Brusa, Judge Nancy A. Becker, Judge Sally Loehrer, Guy Shipler and Attorney General Frankie Sue Del Papa, Chief Deputy Attorney General Brooke Nielsen, and Special Deputy Attorney General Donald J. Campbell, are *ORDERED* individually and separately to communicate with the Clerk of the Supreme Court, at her office in the Supreme Court Building, Carson City, Nevada, on or before March 11, 1994, at 5:00 p.m., during that time, to advise the Clerk as to whether he or she will or will not comply with the discovery order of this court ordering that *all* records, papers, documents, video or audio tapes, exhibits or other materials relating to any investigation or proceeding of any kind concerning Judge Jerry Carr Whitehead be delivered to the Supreme Court for its *in camera* inspection.

Further orders of the court will be issued in due course.[27]

STEFFEN and SPRINGER, JJ., concur.[28]

---

[27]THE HONORABLE THOMAS L. STEFFEN, Vice-Chief Justice, assigned THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in the place of THE HONORABLE ROBERT E. ROSE, Chief Justice. Nev. Const. art. 6, § 19; SCR 10.

[28]VICE-CHIEF JUSTICE STEFFEN and JUSTICE SPRINGER agree that it would indeed be dubious social policy if, after a newspaper had misstated the judge's past rulings in a pending case, the judge could not request a proper correction, without thereby demonstrating "prejudgment" and establishing a disqualifying "financial interest." This, however, appears to be exactly the contention the Attorney General and associates have heretofore sought to tender to this court in a motion to disqualify those justices, based on a request for correction that an attorney for Justices STEFFEN and SPRINGER recently sent to the Las Vegas Review-Journal.

Justices STEFFEN and SPRINGER have been unable to comprehend how their continuing belief in the propriety of rulings already made can possibly constitute a "prejudgment" of issues remaining to be decided herein. Nor have these justices as yet been able to fathom just how their belief that they may have been libeled in connection with reports relating to prior rulings in this case could possibly imbue them with a "financial interest" which would render them disqualified from deciding the remaining issues in this case. Moreover, the prosecutors evidently were unable to locate or cite any legal authority, decided on facts even remotely resembling the circumstances surrounding the correction request tendered by the justices' attorney, in which a jurist has been held to be disqualified either for making a supposed

GUY, D. J., concurring:[1]

I concur with the results. I would go further than the majority pertaining to the Attorney General.

Having decided that the Commission is a part of the Judicial Department, I would further order the Attorney General, her associates and Special Deputy Attorneys General to have no further contact with this case or any other matter appearing before the Commission.

Aside from the obvious Attorney General conflict noted in the majority opinion, article 3, section 1 of the Constitution of the State of Nevada expressly forbids either the Legislature or the Executive to intrude into the Judicial.

Article 3, section 1 of the Constitution of the State of Nevada entitled *"Three separate departments; separation of powers,"* states:

> The powers of the Government of the State of Nevada shall be divided into three separate departments,—the Legislative,—the Executive and the Judicial: *and no persons charged with the exercise of powers properly belonging to one of the three departments shall exercise any functions, appertaining to either of the others, except in the cases herein expressly directed and permitted.*

(Emphasis added.)

The Constitution of the State of Nevada invests the governing of this state in three *co-equal* divisions of government: The Legislative, the Executive and the Judiciary. Neither is more important than the other two. Neither is any less important than the other two. They are co-equal partners in the governing of the State of Nevada. The Constitution of the State of Nevada does not authorize a non-criminal investigation into either the internal

---

"prejudgment" or for having a "financial interest" in the outcome of the case.

Although the other members of this court have heretofore denied the insubstantial motion to disqualify them, Justices STEFFEN and SPRINGER nevertheless wish to lay at rest any lingering concerns, unjustifiably raised in the public mind to the effect that their attorney's correction request to the Review-Journal somehow raised a "financial interest" which might result in a "prejudgment" of issues yet to be decided herein. The two justices, accordingly, hereby release their rights to any damages resulting from prior false statements of the Las Vegas Review-Journal that the request for correction heretofore issued by their attorney might otherwise have the effect of preserving.

[1]The Governor appointed the Honorable Addeliar D. Guy, Judge of the Eighth Judicial District Court, to sit in place of THE HONORABLE CLIFF YOUNG, Justice, who is disqualified because he is a member of the Commission on Judicial Discipline. Nev. Const. art. 6, § 4.

organization or the competency of one branch of government by either of the other two divisions. These matters are left to the voters.

Article 6, section 21(9)(a) authorizes the Commission to use attorneys and attorneys at law to act as counsel to conduct the proceedings. It does not authorize the Attorney General to act in any capacity for the Commission. The use of the Attorney General in an administrative judiciary proceeding for the possible administrative discipline of a member of the judiciary cannot be condoned.

It is certain that to permit the executive department, to wit, the Attorney General, whether upon request or otherwise, to be counsel or in any way participate in the possible disciplinary action procedure of a justice or district judge before whom the Attorney General must appear for judicial decisions, could cause investigations, brought about for political reasons or because of decisions that were unfavorable. The power or ability to bring before the Commission only that information or those facts necessary for a favorable decision for disciplinary action is a great temptation. The temptation becomes even greater if there is only a scintilla of evidence indicating that a justice or district judge might need censoring or a stricter penalty. The Legislature may not authorize that which is forbidden by the Constitution.

I would remand this matter to the Commission to commence or proceed in its investigation and proceedings by an impartial investigator not within the executive or legislative branch. Such investigator, of course, could be an attorney at law.

SHEARING, J., dissenting:

In view of the importance of issues involved in this case, I would grant the motions for reconsideration of orders requiring "in camera" production of documents and the request for oral argument.